## William Tyler v. The People.

Manslaughter, committed by a mortal blow given on the River St. Clair, beyond the boundary line between the United States and the Province of Canada, and within a county in said Province, from which blow death ensued upon land, is not within the Crimes' Act of Congress of March 3d, 1857; and the Circuit Court of the United States has no jurisdiction of the same.

The term "navigable waters," as used in § 5944 of Compiled Laws, has the same meaning as in the Ordinance of 1787, and is not limited to waters where the tide ebbs and flows.

To enable this court to judge of the propriety of instructions to the jury in the court below, which instructions assume the existence of certain facts, the bill of exceptions must either contain the evidence of those facts, or a statement that there was such evidence.

In the absence of a treaty with Great Britain authorising it, the process of the District Courts of the United States sitting in Admiralty cannot be executed in Canadian waters.

TYLER *v.* THE PEOPLE.

To authorize a court to declare a statute unconstitutional, it should be able to point out the part of the Constitution violated, and the infraction should be clear and free from a reasonable doubt.

There is no constitutional objection to the provision (§ 5944 of Compiled Laws) for the prosecution and punishment here of' a homicide committed by a mortal blow, &c., out of the state, from which death results within it.

*Heard May 1st. Decided June 6th.*

Error to St. Clair Circuit.

The pleadings in this case may be found in 7 Mich. 162. Subsequent to the decision of the questions there passed upon by this court, the plaintiff in error put in a plea of Not Guilty, was tried, convicted of murder in the second degree, at the November term, 1859, and sentenced to six years imprisonment in the state prison. Exceptions were filed, and a writ of error taken to this court.

From the bill of exceptions it appears that the defendant requested the court to charge the jury, *first*: "that if they believed, from the evidence introduced tending to show it, that the mortal wound of which the deceased, Henry Jones, died in the county of St. Clair, was given by said William Tyler on the river St. Clair, and not within any county of the state of Michigan, that then said mortal wound was not given on the high seas, or any other navigable waters, within the meaning of section eight of chapter one hundred and ninety-two of the Compiled Laws of the state of Michigan; that there was no evidence in support of the second count of said indictment; that such offense proved was not cognizable in said Circuit Court for the County of St. Clair, and that the prisoner must be acquitted." *Second:* "that if they believed, from the evidence introduced tending to show it, that at the time of the shooting of said Henry Jones, as charged in the indictment, the defendant was a deputy of the Marshal of the United States for the district of Michigan, and had in his possession and exhibited at said time, a writ of attachment of said brig Concord, duly issued under the seal of the District Court of the United States for the District of Michigan, sitting in Admiralty, and that said defendant

at said time, was avowedly attempting to execute said writ, as such deputy Marshal, by taking possession of said brig, unmoored and in motion, or riding at anchor in that part of the river St. Clair lying on the Canadian side of the boundary line between the United States and the province of Canada,—that said brig was an American vessel, and that said Henry Jones was the master of said brig, and was at said time forcibly, and with deadly weapons, resisting and intending to resist said defendant, and said writ, at all hazards; that then said shooting and killing was excusable homicide, and the prisoner must be acquitted." *Third:* "that if they believed, from the evidence introduced tending to show it, that the said mortal wound was given outside the state of Michigan, and not on the high seas or waters affected by the ebb and flow of the tide, the court has no jurisdiction under either count of the indictment, and the prisoner must be acquitted." All which instructions the court refused to give, and defendant excepted.

The errors assigned were, *First*: That the Circuit Court determined the two questions of law held by said court to arise upon the plea of *autre fois convict*, replication and demurrer, and the issue of law so joined, in favor of the People. *Second*: That the Circuit Court overruled the demurrer to the replication. *Third*: That, whereas, the construction of the said statute of the United States, of March 3d, 1857, was drawn in question by the said plea, replication and demurrer, and a right, privilege and exemption was specially set up and claimed by said William Tyler, under the said statute of the United States, by his said plea of *autre fois convict* and demurrer, the said Circuit Court decided against said right, privilege and exemption, so claimed as aforesaid, whereas, by law, said court ought to have decided in favor of the same;" *Fourth, fifth* and *sixth:* That the Court erred in refusing to give to the jury the three several instructions prayed.

*Walker & Russell,* for plaintiff in error:

The matters arising upon the first and third assignments are not discussed, because it is not expected that the court will reconsider the opinion in 7 *Mich.*

1. We contend that there is no jurisdiction in the St. Clair court, on ˉthe face of the indictment.

There is no allegation of the nationality of the brig Concord, or of Tyler, or of Jones, or of the relation of either of them to the brig. Aside from Comp. L. § 5944, there is no foundation for the first count, as is shown under point 3d below; and this statute is to be construed as strictly as the U. S. statutes, considered by *Campbell J., Tyler's Case,* 7 *Mich. and cases cited.*

Offenses committed by foreigners upon American or foreign vessels, or by Americans upon foreign vessels, are not against the dignity of Michigan, and the death within her limits is not an offense.

2. The first instruction prayed was improperly refused. That part of the St. Clair river where the wound was given in this case, is within none of the descriptions in the statute. The word "navigable" does not cover it. It *is a technical word of the common law, used with high seas, in a penal statute, borrowed from English legislation.*

When legislation is upon subjects relating to courts and legal proceedings, or is borrowed from old statutes, we are to consider the Legislature as speaking. technically in respect to the subject matter, and employing a given word in its established sense: — *Dwarris Stat.* 670, 693, 696: *Sedgwick Stat. Law,* 261, 262, 263; 6 *Mod.* 143; *Campbell J.,* 7 *Mich.* 211.

The language is "high seas or any *other* navigable waters;" *i. e.,* any waters of like character with the sea; salt and tide — bays, creeks and rivers, connected with the sea: — 7 *Mich.* 211 ; and see *Sedgwick,* 437.

Penal statutes are strictly construed, *i. e.,* "when there is a doubt, the judiciary will not so construe as to in-

flict a punishment which the Legislature *may* not have intended:"— *Sedgwick,* 327; see, *also,* 324, 336, 333.

If it be said that the words "within the state," apply to the phrase "navigable waters," and that, therefore, fresh waters must have been intended, we reply that those words apply to the word *land,* just previously used, according to grammatical construction; but, if not, they apply to "high seas" as much as to "navigable waters," and there are no high seas in the state.

It is no answer to say that the word "navigable," in § 21, 1 *Comp. L.* 194, referring to streams in this state, is not made use of in the common law sense, as well as in Art. 18, § 4 of the Constitution. The word in these instances means simply floatable streams:— See *Moore v. Sanborne,* 2 *Mich.* 519. The word "land" covers such streams. The common law knows no *waters,* in description of locality, except salt and tide.

And it has been expressly held by this court, that the Detroit and St. Clair rivers are land covered by water, susceptible of private ownership, and, although public streams, yet not navigable in the legal sense:— *People v. Tyler,* 7 *Mich.*; *Lorman v. Benson, ante p.* 18.

3. Aside from the statute, the St. Clair court would have no jurisdiction if the injury was inflicted out of the county. This statute, and § 7 previous, were copied from the Mass. act of 1795, c. 45:— 2 *Pick.* 550, 559. That was from stat. Edw. 6, passed before the settlement of this country:— *Ibid.* 558; 1 *Russ. Cr.* 101, ⸢554, *citing* 9 *Geo.* 4, c. 31.

The second count alleges that the wound was given in St. Clair county, at Port Huron. Under the instruction prayed, as to the locality of the shooting, there would be no evidence in support of that count, and there being none under the first count, unless the St. Clair, in Canada, be navigable waters, the instruction prayed should have been given.

4. The plaintiff in error had a right to arrest the "Concord" in the waters of the St. Clair on the Canadian side of the boundary line, the process being regular on its face. By the law of nations, and by the treaty of 1842, the right of passage with vessels was secured; by the Constitution of 1789, and the act of 1845, the United States acquired admiralty jurisdiction over the lakes and connecting waters — not common law civil jurisdiction, but the right to take cognizance of matters of contract and tort concerning vessels, the instruments of commerce; and, as a necessary consequence, the right to take possession of vessels, in exercising jurisdiction. To arrest an American vessel in the waters in question, is not the exercise of sovereign power over the territory of Canada, but over movable parts of our territory, which, on being moved into these waters, common for passage, and under admiralty jurisdiction, do not lose their subjection to our process, by becoming subject also to the foreign law. The deputy Marshal is invested with official power while upon an American vessel in admiralty waters, although those waters may be subject to the absolute territorial jurisdiction of Canada. Border navigable waters are like the high seas for practical maritime purposes. Territorial jurisdiction over the lakes is mere abstraction. Who can give any county, state or province, as the scene of the battle of Lake Erie?

For such purposes these waters are common, and both Canadian and U. S. jurisdiction may subsist together over the same vessels in some sort, as state and Federal jurisdiction subsist over the same vessels on this side. The U. S. authority, of course, can be exercised only as against private persons in possession of our vessels, and could not interfere with local authority.

This power to take the *ship*, is a highly different thing from the power to arrest a criminal. Our commerce can not be "*regulated*" unless the power to regulate may follow the vessel wherever it has a right of passage, and take

possession of it, *as against our own citizens;* nor can the admiralty jurisdiction be fully exercised, unless the vessel, *as against our own citizens,* may be followed by its process.

Admiralty jurisdiction on the lakes and connecting waters, is practically worthless, if a vessel may elude the Marshal by gliding past the uncertain and imaginary boundary line; and embarrassing uncertainties as to the locality of a given occurrence upon this or the other side, would constantly arise. Congress contemplated no such absurdities.

*J. M. Howard, Attorney General,* for the People:

1. The common meaning of the word *navigable* is the sense in which it is employed in the statute:— See *Ordinance of* 1787, *Art.* 4; 1 *U. S. Stat. at Large,* 468; *Ibid.* 491; 2 *Ibid.* 235, 279, 666, 703; 3 *Ibid.* 349, 492, 546, 756; *Comp. L. pp.* 194, 195; *Const. of Mich. Art,* 18, § 4; 6 *Barb.* 263; *Ang. on Watercourses,* 206; 3 *Caines,* 318; 17 *Wend.* 572; 17 *Johns.* 209; *Lorman v. Benson, ante, p.* 18 *Moore v. Sanborne,* 2 *Mich.* 525.

2. The question whether, admitting the mortal stroke to have been given in Canadian waters, and that death ensued from it in this state, the Legislature have power to provide for the punishment of the offense here, depends on whether the power is prohibited by the state Constitution.

The rule in construing a state constitution, is that the Legislature possesses plenary powers, unrestricted except by the instrument itself; and that the presumption is in favor of the validity of a particular statute until it plainly appears from the Constitution itself that the Legislature had no authority to pass it:—11 *Penn.* 61; 1 *O. S. R.* 77; *People v. Collins,* 3 *Mich.* 348, 349, 354, *Judge Green's opinion; Ibid.* 404, 405, *Judge Martin's opinion;* 15 *N. Y.* 543, 545; *Sears v. Cottrell,* 5 *Mich.* 256.

Our present Constitution certainly contains no prohibition to pass such an act; and the Legislature possesses

all the power that the British Parliament possess over the subject.

By the common law, when a mortal blow was given in one county and death ensued in another, the offender, according to Blackstone, might be tried in either, "because no complete felony was done in any one of them:"— (4 *Bl. Com.* 303, 304); though Bishop (1 *Crim. Law* § 554) thinks the courts anciently *doubted* whether, if the blow was inflicted in one county and death from it followed in another, the offense could be prosecuted in either. But by statute of 2 and 3 *Edward* 6, *Ch.* 24, this doubt, if there was one, was removed, and it was enacted that in such a case the offender was indictable in the county where the party died:— *Starkie's Crim. Pl.* 7 ; *Hawk. B.* 2 *Ch.* 29, § 49.

This ancient statute [1550], has been re-enacted in this country by almost all the state legislatures.

So much for the question between *counties.* But the English Parliament, by the statute of 2 *Geo.* 2, *Ch.* 21, went much further, and enacted that "where any person feloniously stricken or poisoned at any place *out of England*, shall die of the same in England; or being feloniously stricken or poisoned in England, shall die of such stroke or poisoning out of England, an indictment thereof, found by the jurors of the county in which either the death or the cause of death shall respectively happen, shall be as good and effectual in law, as well against principals as accessories, as if the offense had been completed in the county where such indictment shall be found:"— *Starkie's Crim. Pl. p.* 10, 1*st. Am. Ed.;* 4 *Bl. Com.* 330.

By 9th *Geo.* 4, *Ch.* 31, § 7, any *British subject* charged in England with murder or manslaughter committed on land, whether "*in the King's dominions or without*," may be tried and punished in any county of England in which the Lord Chancellor shall, by his commission, direct, in the same manner as if the offense had been committed

in such county; and by section 8 of the same act, it is enacted that "*where any person* being feloniously stricken, poisoned or otherwise hurt, upon the sea, *or any place out of England,* shall die of such stroke, poisoning or hurt in England, or being feloniously stricken, poisoned or otherwise hurt at any place in England, shall die of such stroke, poisoning or hurt, upon the sea, or any place out of England, every offense committed in respect of any such case, whether the offense shall amount to the offense of murder or of manslaughter, or of being accessory before the fact to murder, or after the fact to murder or manslaughter, may be dealt with, enquired of, tried, determined and punished in the county or place in England in which such death, stroke, poisoning or hurt shall happen, in the same manner, in all respects, as if such offense had been wholly committed in that county or place:"—4 *Bl. Com.* 305, *Note* 9, *ed. of* 1844, *N. Y.; Arch. Crim. Pl. p.* 380.

In *Azzopardi's case,* 1 *C. & K.* 203, which occurred in 1843, the fifteen judges held that, under section 7 of the act, the murder of an *alien* by a British subject at Smyrna, was cognizable in the Central Criminal Court in London.

In *Helsham's case,* 19 *Eng. C. L. R.,* the prisoner was indicted under the same section, and convicted of murdering Lieut. Crowther, at Boulogne in a duel.

The statute 'of 33 *Henry* 8, *Ch.* 23, also provides for the indictment and punishment of *British subjects* who commit murder out of the King's dominions:—1 *Taunt.* 26; 1 *Russ. & Ry.* 294.

But it is obvious from the language of the 8th section of 9 *Geo.* 4, *Ch.* 31, and from the act of *Geo.* 2, that Parliament was not wholly governed by the consideration that the offender was a British subject, owing allegiance to the crown; but deemed it sufficient to constitute the crime that the blow or poisoning was without those dominions, and the death within; or that the blow or

poisoning was within, and the death without. The former case is plainly one · of those embraced in our own statute, and precisely the one at bar. The essence of the offense is that the fatal violence, though committed abroad, attaches to and accompanies the victim into the domestic jurisdiction, and there destroys his life. The murderous intent and the murderous act are contemplated as being united, and as continuing upon the victim after he has arrived within the · jurisdiction of the government trying and punishing the offender. The unlawful death is really the crime which he commits, although not personally present. Surely there is nothing in the state Constitution prohibiting the Legislature from passing an act to meet such a case. The real crime itself — *murder* — might otherwise go unpunished; the mere giving of the blow or ad_ministering of the poison being an offense of a far inferior grade, and calling for a far lighter penalty. The statute is no novelty : — *R. S. Mass.* 746 ; *R. S. Wis.* 1858, *p.* 978.

And even without the aid of any such statute, courts hold that where a crime has been begun in one state, and completed in another, the offender is amenable to the laws of the state where it is completed : — 3 *Pick.* 204 ; 6 *East*, 583 ; 3 *Denio*, 185, 206 ; 1 *Comst.* 173 ; 2 *Sumn.* 482 ; 1 *Leach*, 432 ; 4 *Dall.* 426 ; 1 *Wash.* 463 ; 7 *S. & R.* 469 ; 3 *Conn.* 1.

That a crime commenced in one county, and consummated in another, is punishable in the county where completed, has been too often determined to require the citation of authorities : — 21 *Wend.* 509, 527 ; 2 *Barb.* 427, 429 ; 1 *Bish. Cr. L.* § 556 ; *Starkie Cr. Pl.* 10.

The statute creates a new offense not perhaps known to the common law ; — the offense of being the author of the death of a fellow - being, unlawfully and against his will, in this state, by violent means employed out of it. The death was the consummation of the crime, and was the immediate result of the mortal blow given in another

8 MICH—W

jurisdiction. The fatal operation of the wound upon the person of the deceased, while he languished with it, was the same as to criminality as would have been a dose of poison administered at the same place; and it is impossible to see the difference in principle between this case and the cases above cited, of crimes begun in one country state, or county, and completed in another.

3. The bill of exceptions nowhere shows that Jones had any deadly weapon, or that Tyler was attempting to serve his process; and the second instruction asked was therefore inapplicable to the facts of the case. To make a refusal to give an instruction, as to what would be the law under a given state of facts, error, the bill of exceptions must show that there was evidence actually given to the jury conducing to prove that state of facts:—6 *Cranch*, 226; 4 *Cranch*, 62; 1 *Stew. & Port.* 71; 5 *Ibid.* 330; 8 *Johns.* 495; 2 *Pet.* 1; 9 *Wend.* 296.

When the bill does not purport to set out all the evidence, it will be presumed that the evidence, if set out, would sustain the charge:—29 *Ala.* 322; 4 *Ind.* 266.

But is the law such as it is claimed to be in this prayer?

It implies that both being armed with deadly weapons, Tyler persisting in his unlawful attempt to seize the brig, and Jones endeavoring with force and deadly weapons to prevent it, the former had the right to slay the latter. The bill does not show what the actual circumstances were; what use Jones made of the weapon he had, nor whether Tyler retreated "*to the wall*," as the phrase is; *i. e.*, made an honest effort to escape the threatened blow from Jones by retiring from the spot; nor whether Jones used the weapon in such a way as to warrant Tyler in discharging the pistol; nor, even, whether he made any assault at all with his weapon upon Tyler. These important elements in the question are all omitted in the bill of exceptions.

Now, Jones having the right to defend his property

against the attempt to seize it, made by Tyler, it must, in order to show that the homicide committed by Tyler was excusable or justifiable, appear that he was actually attacked and assaulted by Jones with a deadly weapon, and that he was in such imminent danger of being put to death, or receiving some great bodily harm from this assault, that to prevent it he was under the instant and unavoidable necessity of shooting him down. If there was a way of escape open, he was bound to *retreat*, and might not kill his assailant without incurring the guilt of manslaughter, at least: — *Fost.* 277; see *Hale's Pl. C.* 479, 480; 2 *Bish. Crim. L.* §§550, 564, 566, *and note* 2; 2 *Comst.* 193.

MANNING J.:

The errors assigned in this case present the following questions for the decision of the court: *First*, Is the plea of a former conviction a bar to the prosecution: *Second*, Had the Circuit Court cognizance of the offense charged in the first count of the indictment: *Third*, Did the court err in refusing to charge the jury that, if Jones died in the county of St. Clair, of a wound inflicted by the prisoner on that part of the St. Clair river not within the limits of the state, (as there was no evidence to support the second count in the indictment) they should acquit the prisoner. And *Fourth*, In refusing to charge that, if the jury should find the prisoner was a deputy of the Marshal of the United States, and was in the act of serving process, &c., as stated in the request to charge set out in the bill of exceptions, they should acquit the prisoner.

The first question was decided by this court when the case was before us on questions reserved: — *People v. Tyler*, 7 *Mich.* 161. We then held, and we have seen no reason since to change our opinion, that the Circuit Court of the United States for the district of Michigan, in which the prisoner was tried and convicted, had no jurisdiction of the offense

under the act of Congress entitled "An Act in addition to An Act more effectually to provide for the Punishment of Crimes against the United States, and for other purposes," approved March 3, 1857, and that the prisoner's plea of a trial and conviction in that court was therefore no bar to the present indictment.

The next question depends on the construction to be given to § 5944 of Compiled Laws, which is in the following words: "If any such mortal wound shall be given, or other violence or injury shall be inflicted, or poison administered, on the high seas, or on any other navigable waters, or on land, either within or without the limits of this state, by means whereof death shall ensue in any county thereof, such offense may be prosecuted and punished in the county where such death may happen."

It is insisted by the prisoner's counsel, that the words, *navigable waters,* as they are here used in connection with the high seas, should be understood as meaning such rivers or waters only as are navigable from the sea, and in which the tide ebbs and flows; or, in other words, tide waters. We do not feel warranted in giving to them so restricted a meaning. They are used in a statute relating to offenses against the state, and their punishment. They are not used in connection with admiralty law, or courts of admiralty; and as the state has nothing to do with such laws or courts, and there are no waters of the description referred to within her limits, or within several hundred miles of the state, it is quite evident the Legislature must have used the words in a much broader sense, and as including waters in which there is no ebb and flow of the tide. We doubt whether they were ever used in the laws of Michigan in the restricted sense imputed to them, as there is nothing within the limits of the state, or contiguous thereto, to which they could in that sense be made to apply. But there are large lakes and rivers lying partly within her limits, and partly within a foreign state, to which we think

they do apply. They are used in the section under consideration (on which the first count of the indictment was framed) in the sense, we think, in which the same words are used in the ordinance of '87, which provides that the *navigable waters* leading into the Mississippi and St. Lawrence shall be public highways. The Massachusetts statute from which it is said our statute was taken, does not contain these words. We are therefore of opinion the Circuit Court for the county of St. Clair had cognizance of the offense charged in the first count of the indictment.

The construction we have given to the statute disposes of the third question. Whether there was evidence or not to support the second count, which is in the usual form, it would have been error in the court to have charged as requested.

Something was said on the argument as to the power of the Legislature to enact such a law; but as it was not made a point by the prisoner's counsel, we should not now notice it were it not that our brother Campbell, differing with a majority of the court, holds the statute to be unconstitutional. We think it clearly within the scope of the legislative power. We know of no constitutional inhibition; no part of the Constitution with which it comes in conflict: — In *Sears v. Cottrell*, 5 *Mich.* 251, we stated in substance, if not in words, that to warrant us in declaring a statute unconstitutional, we should be able to lay our finger on the part of the Constitution violated, and that the infraction should be clear, and free from a reasonable doubt. We still adhere to the views then expressed. The expediency or policy of the statute has nothing to do with its constitutionality; and if it was a legitimate subject of inquiry and consideration in determining the constitutional question, we should not hesitate in the present instance to declare in its favor; for the crime, though commenced in Canada, was consummated in Michigan.

The shooting itself, and the wound which was its immediate consequence, did not constitute the offense of which the prisoner is convicted. Had death not ensued, he would have been guilty of an assault and battery; not murder; and would have been criminally accountable to the laws of Canada only. But the consequences of the shooting were not confined to Canada. They followed Jones into Michigan, where they continued to operate until the crime was consummated in his death. If such a killing did not by the common law constitute murder in Michigan, we think it the clear intent of the statute to make it such, to the same extent as if the wounding and the death had both occurred in the state.

The only remaining question is, whether the court erred in refusing to charge that, if the jury "believed from the evidence introduced, tending to show it, that at the time of the shooting of the said Henry Jones, as charged in the indictment, the defendant was a deputy of the Marshal of the United States for the district of Michigan, and had in his possession and exhibited at said time, a writ of attachment of said brig Concord, duly issued under the seal of the District Court of the United States for the district of Michigan, sitting in Admiralty, and that said defendant at said time was avowedly attempting to execute said writ, as such deputy Marshal, by taking possession of said brig, unmoored and in motion, or riding at anchor in that part of the river St. Clair lying on the Canadian side of the boundary line between the United States and the province of Canada; that said brig was an American vessel, and that said Henry Jones was the master of said brig, and was at said time forcibly and with deadly weapons resisting and intending to resist said defendant, and said writ, at all hazards; that then said shooting and killing was excusable homicide, and the prisoner must be acquitted."

The court was right in refusing to charge as requested, for two reasons:

*First:* Because the request assumed what does not ap-pear from the bill of exceptions, viz : that the prisoner was a deputy of the Marshal; that he at the time exhibited the writ, and was in the act of executing it; and that Jones forcibly, and with deadly weapons, resisted the exe-cution of the writ. There is no evidence in the bill of exceptions tending to prove these facts, nor any statement. that there was evidence before the jury tending to prove them. Without the evidence itself, or a statement in the bill of exceptions that there was such evidence, we can not determine the propriety or impropriety of the request; or whether the charge, if made, would or would not have anything to do with the merits of the case, or be an ab-stract principle of law, wholly foreign.

*Second:* Because the writ did not authorize the seizure of the vessel in Canadian waters. The process of a court is if no force or validity beyond its territorial jurisdiction. Validity may be given to it by statute, or a law of the state, coextensive with the state, but no extra territorial validity whatever can be given to it without the consent of the sovereignty of such territory; and we know of no treaty between the United States and Great Britain au-thorizing the service of the writ in Canada.

The judgment must be affirmed.

MARTIN CH. J., and CHRISTIANCY J. concurred.

CAMPBELL J.:

I concur with my brethren in adhering to the views formerly expressed upon the questions reserved, when this case was presented to us heretofore; for the reasons given in the reported decision in 7 *Mich.* 161. I am also of opinion that process can not legally be served in a foreign jurisdiction.

But I am unable to discover any authority, in the state of Michigan, to punish an offense like the one here charged upon the plaintiff in error. The record raises expressly

the question whether the Circuit Court for St. Clair county had jurisdiction to punish such an offense. Counsel for the prisoner based his argument mainly upon the want of power in this state to punish acts committed abroad by any but its own citizens; and, assuming that, as to them, it might exist, claimed that no case was made out by the indictment on that hypothesis. My brethren sustain the act as applicable to such an offense as it describes, committed by any one. As the record can only be sustained by overruling the objections and errors assigned, the sufficiency of which depends on their own legal character, it becomes necessary to inquire into the validity of the statute, as well as its construction. This is the more important, as this case is the first which has called for any decision upon it, and must stand as a precedent.

Section 5944 of the Compiled Laws (which is the section under which this prosecution is had) is found in a chapter devoted to a number of miscellaneous provisions concerning criminal prosecutions; and is as follows: "If any such mortal wound shall be given, or other violence or injury shall be inflicted, or poison administered, on the high seas, or on any other navigable waters, or on land, either within or without the limits of the state, by means whereof death shall ensue in any county thereof, such offense may be prosecuted and punished in the county where such death may happen." Tyler is charged with having wounded Jones in Canadian waters, whereof he died in this state.

It will be observed that this statute neither creates nor defines any offense. Its original source was an English statute which, like the Massachusetts statute from which ours was more immediately copied, has never been construed. Neither of these statutes imposes any punishment whatever. Unless there is to be found somewhere else upon the statute book some offense which corresponds with this description, the whole section remains inopera-

tive. We must therefore look into the other statutes of the state to determine what punishable offenses this statute embraces.

No common law offense can be punished in this state by more than two years imprisonment in the county jail, or more than two thousand dollars fine, unless an express provision is made by statute for a different punishment: *Comp. L.* § 5958.

The only homicides [punishable under our laws are murder and manslaughter. Manslaughter is punishable by that specific name; the statute neither defining nor grading it, but punishing the common law offense known as such: — *Comp. L.* § 5720. Murder is divided into two degrees, but the offense is not defined except by its common law name; and all that the statute does in regard to it is, to divide murder at common law into classes, punishable according to their several degrees of malignity: *Comp. L.* §§ 5711, 5712. Nothing is murder under this statute which was not murder at common law: — *People v. Potter*, 5 *Mich.* 1; *People v. Scott*, 6 *Mich.* 287. And if Tyler's offense was not an offense at common law, I do not very well perceive how it can be justiciable in any of our courts. For there can be no power to try for an act which is not punishable. Before inquiring, therefore, into any other considerations of construction or validity, it is important to ascertain what was murder within the common law definitions.

The common law definitions all agree in substance. Hawkins defines murder to be the wilful killing of any *subject* whatsoever, through malice aforethought, whether the person slain shall be an Englishman or a foreigner: — 1 *Hawk. P. C.,* B. 1 *Ch.* 31 § 3. And the other authorities either use the same language, or define it as the malicious killing of "*any person under the King's peace.*" *Rosc. Cr. Ev.* 690; 1 *East. P. C.* 214; 3 *Inst.* 47; 1 *Russ. Cr. L.* 482.

The slayer must also, under all the authorities, owe temporary or permanent allegiance to the sovereign. If a native of the realm, his allegiance is held to follow his person everywhere; and it has been held that the common law definition of murder would attach to the act, whether within or without the realm, if committed by one owing allegiance upon another owing it. The term "*under the peace of the King*," signifies *under the protection of the King*, which is supposed to embrace his subjects everywhere, but can only act upon foreigners within his dominions:— See *Rex v. Sawyer*, 2 *C. & K.* 101; *Regina v. Serva*, 2 *C. & K.* 53; *Rex v. Helsham*, 4 *C. & P.* 394; *Rex v. Mattos*, 7 *C. & P.* 458; *Depardo's Case*, 1 *Taunt.* 26. The slaughter of an Englishman anywhere, by an Englishman, was an offense against the Crown, because depriving it of a subject. The slaughter of a foreigner within the realm was a direct invasion of the peace. But the slaughter of a foreigner abroad, and out of the protection of the King, attacked neither his peace, nor dignity or prerogative, and was no offense at common law. And so closely did the idea of protection attach to the crime that, at common law, and until a statute interfered, it was said that "if a man be attaint in a *pœrmunire*, whereby he is put out of the King's protection, the killing of him was held not homicide:— 1 *Hale P. C.* 433. And the reason is given in *Viner's Abr.* "*Murder*, 3." "If a man kills one who is attainted by *pœrmunire*, this is not Felony, for he is out of the King's protection, which is the same as if he was out of the realm and power of the King."

The definitions of the common law applicable to murder are broad enough to cover very nearly every such killing of malice aforethought as would come, by the broadest construction, within the power of the British government to punish at all. And, accordingly, the various statutes which have been passed have not defined offen-

ses, but merely prescribed the place of trial, and the courts to have cognizance of the offenses. And where a crime has been committed, punishable by the sovereignty, the selection of a place of trial is not a question of power, but merely one of convenience. Those doctrines which required a particular venue for common law prosecutions, had nothing to do with the definition of the crime of murder. They merely regulated the mode of prosecution. And therefore when the common law courts could not act, according to their ancient practice, Parliament inter-fered — not by defining new offenses, but by furnishing means to try what were already within the common law definitions. A want of attention to this has sometimes led to confusion in the definition of offenses.

The old rule requiring every offense tried in the common law courts to be inquired of in the county where it occurred, originated in the peculiar constitution of the early juries. They were not selected merely to hear evidence and pass upon it. They were witnesses, as well as triers; and were supposed to act on knowledge derived in their own vicinage. Where an inquiry was necessary into matters occurring in different counties, there was no adequate machinery for conducting it. The rule survived its reason; and has been maintained since for convenience rather than necessity; and may therefore be modified upon proper occasion. But, formerly, if a fatal blow was given in one county, and death happened in another, the homicide could not be within the knowledge of the jurors of either county; those who could speak as to the blow having no means of ascertaining the death; and *vice versa*. But it was settled that, by carrying the dead body into the county where the wound was given, so that death could be shown by view, the offense might be tried there: 1 *Bish. Cr. L.* § 554, *and citations.* And although it may be regarded as doubtful, there are nevertheless very high authorities for saying that, at common law (but probably

when jury trials became more improved) a trial might always be had in the county where the mortal blow was given, "*for that alone is the act of the party, and the death is but a consequence:* — 1 *East P. C.* 361; 1 *Hale P. C.* 426 ; 1 *Bish. Cr. L.* § 454. And it was also necessary at common law, originally, in a case of this kind, to remove the body to the county where the injury was given, in order to have the coroner's inquest : — 1 *East P. C.* 361; 1 *Hale P. C.* 426; 2 *Hale P. C.* 66. The office of a coroner being to make inquisition concerning sudden or violent deaths, and he being required to act upon a view of the body, the rule referred to has a very strong bearing on what really, in the eye of the law, constitutes the offense in murder; a subject to which I shall refer presently in another connection. The statute of 2 and 3 *Ed.* 6 *c.* 24, provided that, in case of a mortal injury in one county, followed by death in another, an indictment found in the county where death happened should be "as good and effectual in law as if the stroke or poisoning had been committed and done in the same county where the party shall die, or where such indictment shall be so found:" — 1 *East P. C.* 362. This statute originated the practice of indicting at the place of death; and an idea has hence sometimes gained currency that the place of death was the place of the offense; an idea which the language used is not at all calculated to convey, and which is inconsistent with various rules to which I shall refer, in addition to what has already been mentioned.

The statutes of 28 and 33 H. 8 provided for offenses committed at sea, or abroad, and have been repeatedly held to create no new offenses, and to punish none but those under temporary or permanent allegiance.

In the hearing on the questions reserved we had occasion to consider the construction of various American statutes, which, although using words of unlimited meaning, have always been confined in their operation to offenses

committed by persons over whom we have an undoubted jurisdiction. It is unnecessary to repeat the views I then expressed. See 7 *Mich.* 161.

These rulings of the English and American authorities have all been made in clear recognition of the law of nations, which allows no country to punish offenses not against its own peace or sovereignty; unless they are offenses against the whole human race, which would after all come within the same reason. No offense committed abroad, except by a citizen or subject of a country, can, upon any rule of law recognized in our jurisprudence, be held punishable by that country: — 1 *Bish. Cr. L.* § 581; *Wheat. Int. L. (Ed. of 1855)* 174, 175.

If this statute is construed to punish an act done abroad (and, under the construction which my brethren put upon it, I must regard it as so doing), then it is void, not because in violation of any specific clause of our state Constitution, but because all of our constitutions are subject to the law of nations, which is expressly recognized by the Federal Constitution, and which confines the power of every civilized commonwealth within fixed bounds. Even the so-called omnipotence of Parliament has never been held to transcend these limits. Not only is this evidenced by the settled rules of construction which confine the operation of statutes within these principles, but *Comyn* expressly enumerates among "What things the Parliament can not do," that "*it can not do any thing out of the limit of its jurisdiction:*" — *Com. Dig., "Parliament, K."* Our limits are fixed by our Constitution in conformity to treaties with Great Britain.

If we should concede that the state of Michigan has all the powers of an independent nation, the power to punish Tyler for any offense committed in Canada must depend upon his citizenship, which must be averred; and to punish him for a common law homicide, the citizenship of Jones is equally necessary to be averred, in terms, or by language equivalent: — *Rex v. Helsham,* and *Rex v. Sawyer, supra.*

But I do not conceive that any state of this Union has any such extra territorial power over its citizens. This power is inseparably connected with the duty of protection. This duty can not, under our Federal Constitution, be exercised abroad by the individual states. It belongs to the power which can levy troops, maintain navies, declare war, and hold diplomatic intercourse with other nations. This every state in the Union is forbidden to do. Even within the Union, the citizens of one state are protected in another by virtue of the Federal Constitution. Their own state can not protect them. And upon no principle can its peace and dignity be considered as invaded where, if its own citizens are aggrieved, it has no right, as a state, to communicate with the public authorities at all, whether to supplicate or to demand their rights.

I have referred to this doctrine, that no state can extend its criminal laws beyond its own jurisdiction, because that is precisely what I think this statute has attempted, if reaching this case. But my brethren, who I presume do not deny the doctrine, regard this offense as a domestic, and not as a foreign offense. Can it be so regarded?

If it be a domestic offense, it is made so by the single fact that Jones died in Michigan. It is not pretended that Tyler did any violence to him in this state. But my brethren hold, that the death not only completed the offense or crime of murder, but, as a consequence of Tyler's act, served to bring him constructively into a violation of our laws, within our jurisdiction. In other words, to maintain this view it must be claimed that the murder was committed, in law, in St. Clair county, because Jones died there. For our statutes punish the whole crime, and not a part of it, even if it be divisible; and they punish it, if at all, as murder. The offense mentioned is the blow or wound followed by death; and not the death, or the languishing and death, alone. And we can not very well conceive of a murder at common law,

or at all, which does not include the active agency of some one in the infliction of that injury which is the cause of death.

The doctrine of constructive presence has no applicability to such a case as this. All that it amounts to is, that the crime shall be regarded as committed where the injurious act is done. A wounding must of course be done where there is a person wounded, and the criminal act is the force against his person. That is the immediate act of the assailant, whether he strikes with a sword or shoots a gun; and he may very reasonably be held present where his forcible act becomes directly operative. But when the bullet rests, or the sword is withdrawn, he ceases to act. And the suffering which the wounded person subsequently undergoes, is not an act, but a mere consequence; a distinction which is real and essential, and can not be disregarded. The death of the assailant before his victim, would not stop the progress of the latter's lanquishing, nor would the hearty repentance and earnest efforts of the guilty man to bring about a cure, remove his liability, should the hurt person die. Yet it would be absurd to say he continued to have a criminal intent, and that every new pang of the sufferer was a new criminal act of guilt. There is but one guilty act, which consists of the blow or wounding, inflicted with malicious intent; and the suffering and death are both merely effects of that one act. There can be no criminal act unless accompanied by a co-existing criminal intent. If there is no act done within this state with criminal intent, the state has no power to punish; for no crime has been committed within its jurisdiction. This has been very well illustrated in a case in *Plowden* (*p.* 261) where a question arose concerning a forfeiture, where a man became *felo de se*. There, as in other homicides, the offense consists in an injury followed by death within a year and a day; and if the lanquishing in murder can be regarded as a series of

criminal acts of the slayer, the same reason would hold good in self-murder, and repentance would remove the criminal intent necessary to characterize those acts. But BROWN J. supposes the case of a man who "voluntarily gives himself a mortal wound, and afterwards he repents and is reconciled to holy church;" and says, for all that the King shall have forfeiture of his goods. A man may beyond doubt be held criminally responsible for the consequences of his acts, if those acts are themselves criminal; but they must be reached through the acts. It is the act that breaks the peace, that sets an evil example, and that causes all the mischief. And it would be introducing a principle which has no sanction in the common law, and for which I have been able to see no reason, son, to hold that a man may be punished for results, where he can not be punished for his acts which caused them.

I have intimated that the place of prosecution prescribed by the statute of Edward, was not in affirmance of the common law ; and that the place of death did not, at common law, draw after it the previous assault, so as to bring it constructively within the same jurisdiction. As the whole reasoning of my brethren seems to me to rest upon this assumption, I propose to refer to various authorities to determine it.

In the first place, this statute asserts upon its face, that it was doubtful whether, if a blow were given in one county and death followed in another, any indictment lay. The language is, "in such case it hath not been found, by the laws or customs of this realm, that any such indictment thereof can be taken in either of the said two counties :"— 1 *East P. C.* 361. If it would previously have been good in either, we have seen that it was in the county of the act, and not of the death. It is also to be remarked that the statute refers to cases where everything occurred within the jurisdiction of England; and nothing

therefore was usurped in fixing any venue whatever. And the language used, that the indictment shall be "*as good as if the stroke or poisoning had been committed and done in the same county where the party shall die, or where such indictment shall be so found,*" indicates plainly that the stroke was not a subordinate consideration. Where a person died on land from a wound received, at sea, it was not triable by the common law courts of ordinary jurisdiction, although the stroke was within the realm: — 1 *East P. C.* 365, — because it was not given in the body of a county. Here again we have an example that the place of death did not govern. And a stroke on land followed by death at sea did not give jurisdiction to the admiralty: 1 *Hale P. C.* 426; *Constable's Case,* 2 *Co. R.* 93*a.* But there are less uncertain authorities than these.

By the common law, all persons present at the commission of a crime, aiding and abetting, are principals. It is laid down by *East,* that where the stroke and death are laid on different days, the abetment should be laid to the stroke, and not to the death: — 1 *East P. C.* 351; 2 *Hawk. P. C. c.* 23, § 89. And see also *Viner's Abr.* "*Murder, W.*" In *Rex v. Hargrave,* 5 *C. & P.* 170, it was expressly decided, in a case tried in 1831, where the stroke was given in one county and the death occurred in another, that the *felony* was in the first county. The indictment stated that J. C. assaulted the deceased at, &c., in the county of Middlesex, &c., of which he lanquished and died in Kent; and then proceeded as follows: "And the said James Hargrave, together with, &c., were *then and there* present aiding, abetting, &c., the said James Cox *in the commission of the said felony.*" It was objected for the prisoner that the indictment was bad, as it did not, with certainty, charge the prisoner with the commission of the offense in any particular place; for the word *there* referred to the two parishes. But Patterson J., said "the giving of the blows which caused the death consti-

8 MICH.— X

tutes the felony. The languishing alone, *which is not any part of the offense*, is laid in Kent; the indictment states that the prisoners were then and there present, aiding and abetting in the commission of the said felony; that must, of course, apply to the parish of All-Saints, Poplar, where the blows which constitute the felony were given; and the words *then and there* refer with sufficient certainty to that parish."

The reason given by *East* and *Lord Hale*, why, before the statute of 2 and 3 Ed. 6, *c.* 24, an indictment lay in the county of the stroke, is because "*that alone is the act of the party, and the death is but a consequence:*" — 1 *East P. C.* 361; 1 *Hale P. C.* 426.

In *Cole's Case*, *Plowden*, 401, Cole was indicted for the murder of Elizabeth Pembroke, who was wounded on the 12th day of February, and died on the 18th day of June. Cole pleaded an intermediate pardon of all felonies, misdemeanors and offenses. It was insisted that his act did not become a felony until the death, and therefore was not one of the felonies pardoned. But "the justices agreed that the pardon discharged him, because the wound given by the prisoner was the cause of the felony; the giving of which wound was an offense and misdemeanor against the Queen; and that being pardoned by the act, all the consequences that followed from the said offense are also pardoned thereby."

In *Riley v. The State*, 9 *Humph.* 646, where the question of venue under the constitution was involved, the injury and death being in different places, the court say: "Although at common law it was said the offense was not complete until the death, yet it would be doing violence to language to say that the offense was committed in the county where the death happens, although the stroke was committed in another county."

But perhaps the most reliable rule can be drawn from the decisions relating to forfeitures for felony. It is said

by Lord *Hale* that "the relation of the forfeiture or escheat of lands for treason or felony, to avoid all mean incumbrances, is to the time of the offense committed:" 1 *Hale P. C.* 360.

In *Dame Hales'* case, *Plowden*, 253, (*Hales v. Petit*) Sir James Hales and his wife being seized jointly of an interest in certain leaseholds, he became *felo de se*. Upon a question made concerning the right in his widow by survivorship, it was adjudged that the forfeiture related back beyond his death, to his act that caused it; and the wife's survivorship was anticipated and cut off. And the case was put of a man giving himself a mortal wound, and living for some time, but not for a year and a day; it being declared that, from the time of the original offense, which was the cause of the death, the forfeiture took effect by relation, and would avoid all his dispositions of property made thereafter. "And also, they agreed, in the argument of this case, that if one gives another a mortal wound, and he dies of this wound, and he that killed him is attainted by verdict, the escheat of his land shall have relation to the time of the wound given." And in *Ventris*, 371, it is said "if one giveth another a mortal wound, and then sells his land, and the person dies, there shall be such relation as to make the land forfeited from the first stroke." See to the same effect *Viner's Abr.* "*Forfeiture*, R.;" 1 *Hale P. C.* 426. As a forfeiture was a distinctive feature of a common law felony, I can not but regard these rules as of much weight in deciding the legal effect of the prisoner's conduct. In cases where both death and the cause of death occur within the jurisdiction, the matter is of comparatively little importance how the criminal liability is apportioned; but when the only act done is done beyond our jurisdiction, and yet we seek to punish it, what was before a speculative question becomes one of capital moment.

That principle of the law of nations which denies to any country the right of punishing offenses committed abroad,

except by its own subjects, rests upon the ground that it has no right to control abroad, in any way, the conduct of foreigners; who must obey the law of the place where they may happen to be, but are responsible to no other power, unless through their allegiance. We have no legitimate concern with the actions of men in Canada, not breaking our peace, or assailing our sovereignty. It is not pretended by any one that, when Tyler shot Jones, he was at the time, in any sense, offending against the state of Michigan. Had Jones died on the spot, this state could not have interfered with Tyler for it. And so long as Jones remained abroad, Tyler was confessedly no infringer of our laws. Tyler committed no act of violence within our borders. For aught that we know, he may have been occupied in yielding aid instead of injury. What, then, can render him a criminal against this state? When and how did he disturb our peace and good order? Jones was not brought here in the prosecution of any murderous design. So far as Tyler is concerned, he might have been carried to Canada as well. Had Jones lived for a few months, although afterwards dying of his wounds, he might have traversed half the states of the Union, and Tyler could have had no voice in controlling his motions. He might go where murder is punished by death, or he might come here, where it is merely a state prison offense; and yet Tyler would be responsible, if this prosecution can be maintained, to any state or country against which the voluntary choice of Jones might make him a constructive offender. Inasmuch as all present encouraging a prize fight are principal offenders, in case either of the combatants is slain, or subsequently dies of his injuries, and are thus made guilty of murder or manslaughter — (*Rex v. Hargrave*, 5 *C. & P.* 170; *Rex v. Murphy*, 6 *C. & P.* 103), in case either of the persons who have recently edified the English public by such an exhibition should visit this state, and die here, within a year and a day, of injuries there received,

the whole distinguished company that attended that exhibition would become guilty of manslaughter against the peace and dignity of the state of Michigan. And the resort of invalids to hospitals and watering places, for treatment, may, by the death of any one, subject any absent aggressor to the criminal laws of a state he has never seen, should his occasion call him thither at any subsequent period of his life. This is making the guilt of the offender spring from the acts of others, and not from his own. And it is importing into the criminal law a principle at variance with its whole reason. How can the public be wronged by the peaceable entrance of a sick or wounded man, or by his dwelling or dying here? We have no right to exclude him unless his disease endangers the public health. And if any harm arises from his coming, he, or those who bring him, are the public disturbers, and not those who have somewhere else contributed to cause his infirmity or disease, but who could not prevent him from going where he should see fit to go.

I think the judgment should be reversed, for want of jurisdiction to try such an offense.

*Judgment affirmed.*