## COMMONWEALTH vs. CHARLES H. MACLOON & others.

A citizen of another state, or of a foreign country, may be convicted, under the Gen. Sts. c. 171, § 19, of the manslaughter of a person who dies within the Commonwealth of injuries inflicted upon him by the accused in a foreign merchant vessel upon the high seas.

Under the Gen. Sts. c. 171, § 19, providing for the punishment of causing death within the state by means of "a mortal wound given, or other violence or injury inflicted" without the state, a conviction may be had for causing death by starvation or exposure.

An indictment under the Gen. Sts. c. 171, § 19, which alleges that the death was caused by a wounding, an exposure and a starving, is not bad for duplicity, nor for failure to allege that the wounding, exposure and starving were mortal, or of a mortal nature; and is sustained by proof that the death was caused by all or any of the alleged means.

On the trial of an indictment against three, for manslaughter, which alleged that the defendants made several assaults on the deceased from which death ensued, the judge instructed the jury that, if any one of the defendants took part in any alleged act which was the cause of death, such defendant could be convicted, but that no defendant could be convicted unless he took part in all the acts which caused death. Two of the defendants were convicted, and one acquitted. *Held*, that the convicted defendants had no ground of exception.

INDICTMENT returned into the superior court in Suffolk against Charles H. Macloon, Nicholas Kearney and Frank Macloon, for manslaughter.

VOL. V.          1

The indictment alleged that the defendants, on December 1, 1867, and on divers other days and times between that day and February 6, 1868, on the high seas, in and upon Charles E. Hooper feloniously, wilfully and designedly did make divers, to wit, twenty assaults, and with a club and with a belaying pin and with a rope and with an iron hook and with a heaver in and upon his head, chest, arms, shoulders and back at the several times aforesaid on the high seas aforesaid feloniously and wickedly did strike and beat, then and there thereby giving to him in and upon his head, chest, arms, shoulders and back divers, to wit, twenty wounds; and did then and at the several times aforesaid there inflict divers other injuries upon his body, by then and there wilfully, designedly and feloniously exposing him to the severities of the weather and to the wind, the rain, the frost and the cold, and by then and there wilfully, designedly and feloniously depriving him of sufficient and suitable food and nourishment, the defendants being then and at said several times there legally obliged and bound to supply him with sufficient and suitable food and nourishment, and having sufficient and suitable food and nourishment to give him, and he being unable to procure and provide for himself such suitable food and nourishment; that after the injuries aforesaid inflicted as aforesaid upon him, he came to Chelsea in the county of Suffolk and this Commonwealth, and there, by means of the wounds and other injuries aforesaid, so as aforesaid inflicted by the defendants upon him, he, on February 6, 1868, did die; and so the defendants in manner and form as aforesaid did feloniously kill and slay him; against the peace of said Commonwealth, and contrary to the form of the statute in such case made and provided.

Before the jurors were sworn to try the case, the defendants moved to quash the indictment, for want of jurisdiction, for duplicity, and for want of a proper, sufficient and legal description of the wounds or injuries supposed or the character or effect thereof. But *Rockwell,* J. overruled the motion.

At the trial it appeared that Charles H. Macloon, a citizen of Maine, was master, Nicholas Kearney, an Englishman, was

mate, and Frank Macloon, a citizen of Maine, was third mate of the British ship Themis, sailing under the British flag from Liverpool on a voyage to Boston in this Commonwealth, where she arrived February 4, 1868; and that Charles E. Hooper, a citizen of Maine, was a seaman of and upon said ship. There was evidence tending to prove the allegations of the indictment, and that Hooper was carried from the ship at the wharf in Boston, on the morning of February 5, to the hospital in Chelsea, where he died on the following day.

The defendants requested the court to instruct the jury that if the defendants committed the crimes set forth in the indictment upon the high seas beyond the boundaries of Massachusetts, they were guilty of no violation of the laws of the Commonwealth, and could not be punished under those laws, although the death occurred in the county of Suffolk; that in order to convict the defendants under the Gen. Sts. c. 171, § 19, the jury must find that the death of Hooper was caused by violence or injuries inflicted through actual force by the defendants, and not by the negligence or refusal of the defendants to furnish food and nourishment to him, or by exposing him to cold, &c.; that in order to convict all of the defendants they must be proved to have committed jointly all of the acts necessary to constitute the offence set forth in the indictment; and that the government must prove that Hooper's death was caused by all the means and in the manner as set forth in the indictment.

The court refused so to instruct the jury, and instructed them as follows: " In order to sustain the indictment against all the defendants, the government must prove the acts alleged, or some, or some one of them; that the death ensued in the county of Suffolk from the said act or acts proved; and that all the defendants were guilty of said act or acts; that they were all guilty at the time of commission, being present doing the act or acts, or then and there aiding and abetting in the doing. No defendants not present, doing, or aiding or abetting in doing an alleged act or acts, from which death ensued, can be found guilty. But if the jury are satisfied that any one or more of the alleged acts was or were the cause of the death, they may inquire whether

the defendants, or any two, or any one of them did, or, being present with others, aided and abetted in the doing of said act or acts, and any defendant who is proved to have done, or being present to have aided or abetted in doing said acts, may be found guilty. No defendant can be convicted of manslaughter, from his mere neglect, unless it is neglect of a duty he was legally bound to perform. No defendant can be convicted unless he did, or was aiding or abetting the doing of all the acts which occasioned the death. If the jury are satisfied, beyond reasonable doubt, upon the whole evidence, that a certain act or certain acts was or were the cause of the death, and that either, any, or all, of the defendants wilfully and knowingly did, or being present aided or abetted in doing said act or acts, those thus participating may be found guilty. The facts, if proved, that the wounds and injuries were inflicted and received upon the high seas, on board a British ship, and under the British flag without this Commonwealth, will not be fatal to the maintenance of the indictment; provided death resulting from said wounds and injuries ensued in the county of Suffolk."

The jury found Charles H. Macloon and Nicholas Kearney guilty, and acquitted Frank Macloon. Charles H. Macloon and Nicholas Kearney alleged exceptions.

*J. H. Bradley & F. F. Heard*, for the defendants.

*C. Allen*, Attorney General, for the Commonwealth.

GRAY, J. The defendants, the one a citizen of Maine, and the other a British subject, have been convicted in the superior court in Suffolk of manslaughter of a man who died within the county in consequence of injuries inflicted by them upon him in a British merchant ship on the high seas.

The principal question in the case is that of jurisdiction, which touches the sovereign power of the Commonwealth to bring to justice the murderers of those who die within its borders. This question has been ably and thoroughly argued, and has received the consideration which its importance demands.

The statute on which the defendants were indicted, after prescribing the punishment for murder and manslaughter, provides that " if a mortal wound is given, or other violence or injury in-

flicted, or poison is administered, on the high seas, or on land either within or without the limits of this state, by means whereof death ensues in any county thereof, such offence may be prosecuted and punished in the county where the death happens." Gen. Sts. *c.* 171, § 19.

This statute is founded upon the general power of the legislature, except so far as restrained by the Constitutions of the Commonwealth and of the United States, to declare any wilful or negligent act which causes an injury to person or property within its territory to be a crime, and to provide for the punishment of the offender upon being apprehended within its jurisdiction.

Whenever any act, which, if committed wholly within one jurisdiction would be criminal, is committed partly in and partly out of that jurisdiction, the question is whether so much of the act as operates in the county or state in which the offender is indicted and tried has been declared to be punishable by the law of that jurisdiction.

A good illustration of this is afforded by the cases of oringing stolen goods from one jurisdiction to another. It has been held from the earliest times that if a thief steals goods in one county, and brings them into another, he may be indicted in either county, because his unlawful carrying in the second is deemed a continuance of the unlawful taking, and so all the essential elements of larceny exist in the second; but if he takes the goods by force, although this is robbery in the county in which he first takes them, it is but larceny in any county into which he afterwards carries them, because no violence to the person has been used in the latter. 1 Hale P. C. 507, 508, 536. 2 Hale P. C. 163. 4 Bl. Com. 305. If he steals goods on the high seas or in a foreign country, and brings them into this state, it is not a common law larceny, because there has been no taking against the law which is invoked to punish him. *Butler's case,* 13 Co. 53; *S. C.* 3 Inst. 113. *Commonwealth* v. *Uprichard,* 3 Gray, 434. Yet if the legislature see fit to provide that the bringing into the state, of goods taken without right from the owner in a foreign country, shall be punished here as larceny, it

is within their constitutional authority to do so. *People* v. *Burke*, 11 Wend. 129. *State* v. *Seay*, 3 Stew. 123. *Hemmaker* v. *State*, 12 Missouri, 453. By a series of decisions, beginning while the states of this Union were colonies of Great Britain, it has been held that a bringing into Massachusetts of goods stolen in another colony or state subject to the same national sovereignty might be indicted here as a larceny at common law. *Commonwealth* v. *Andrews*, 2 Mass. 14, and cases cited. *Commonwealth* v. *Holder*, 9 Gray, 7. And in other states, in which the common law has been held not to reach such a case, a statute declaring such bringing to be larceny in the state into which the goods are brought has been acknowledged to be valid and binding upon the courts. *Simmons* v. *Commonwealth*, 5 Binn. 619. *Simpson* v. *State*, 4 Humph. 461. *Beal* v. *State*, 15 Ind. 378.

The general principle, that a man who does a criminal act in one county or state may be held liable for its continuous operation in another, has been affirmed in various other cases. Thus a man who erects a nuisance in a river or stream in one county or state is liable, criminally as well as civilly, in any county or state in which it injures the land of another. *Bulwer's case*, 7 Co. 2 b, 3 b. 2 Hawk. c. 25, § 37. Com. Dig. Action, N. 3, 11. Abbott, C. J., in *The King* v. *Burdett*, 4 B. & Ald. 175, 176. *Thompson* v. *Crocker*, 9 Pick. 59. *Stillman* v. *White Rock Manufacturing Co.* 3 Woodb. & Min. 538. And one who publishes a libel in another state, in a newspaper which circulates in this Commonwealth also, is liable to indictment here. *Commonwealth* v. *Blanding*, 3 Pick. 304. There is no more reason against holding the wrongdoer criminally liable in the county and state where his victim dies from the continuous operation of his mortal blow, than in those to which the flowing water carries the injurious effect of his nuisance to property, or the circulation of his libel extends the injury to reputation.

Criminal homicide consists in the unlawful taking by one human being of the life of another in such a manner that he dies within a year and a day from the time of the giving of the mortal wound. If committed with malice, express or implied

Commonwealth *v.* Macloon & others.

by law, it is murder; if without malice, it is manslaughter. No personal injury, however grave, which does not destroy life, will constitute either of these crimes. The injury must continue to affect the body of the victim until his death. If it ceases to operate, and death ensues from another cause, no murder or manslaughter has been committed. But if the bullet remains in the body so as to press upon or disturb the vital organs and ultimately produce death, or the wound or the poison causes a gradual decline of health ending in death, the injury and death are as much the continuous operation and effect of the unlawful act, as if the shot, the stab or the poison proves instantly fatal. The unlawful intent with which the wound is made or the poison administered attends and qualifies the act until its final result. No repentance or change of purpose, after inflicting the injury or setting in motion the force by means of which it is inflicted, will excuse the criminal. If his unlawful act is the efficient cause of the mortal injury, his personal presence at the time of its beginning, its continuance, or its result, is not essential. He may be held guilty of homicide by shooting, even if he stands afar off, out of sight, or in another jurisdiction. 1 Hale P. C. 475. *People* v. *Adams*, 3 Denio, 207; *S. C.* 1 Comst. 176, 179. If he knowingly lets loose a dangerous beast, which runs any distance and then kills a man; or incites a madman or a child not of years of discretion to commit murder in his absence, whereby any one is killed; or, with intent to murder, leaves poison with another person to be administered to a third, and the poison is administered by the same or another innocent agent, and causes the death of the person intended, or any other; he is responsible as principal, to the same extent as if personally present at the actual killing. 1 Hale P. C. 430, 431, 615, 617. *Regina* v. *Michael*, 9 C. & P. 356; *S. C.* 2 Moody, 120. *People* v. *Adams*, 3 Denio, 207, 208. And if he wilfully inflicts a wound which results fatally, he is not excused by the fact that the negligence of the wounded man or the unskilful treatment of surgeons hastens or contributes to the death. 1 Hale P. C. 428. *Commonwealth* v. *Hackett*, 2 Allen, 136. The person who unlawfully sets the means of death in motion,

whether through an irresponsible instrument or agent, or in the body of the victim, is the guilty cause of the death at the time and place at which his unlawful act produces its fatal result; and, according to the great weight of authority, may be then and there tried and punished, under an express statute, if not by the common law.

The crime not being murder or manslaughter before the death, an indictment alleging the stroke at one day and place, and the death at another day and place, is good if it alleges the murder or manslaughter to have been at the time and place of the death, but bad if it alleges that the defendant killed and murdered the deceased at the day and place at which the stroke was given, "for," in the words of Lord Coke, "though to some purpose the death hath relation to the blow, yet this relation, being a fiction in law, maketh not the felony to be then committed." 2 Inst. 318. 1 Hale P. C. 427. 2 Hale P. C. 188. So the year and day "after the deed — *apres le fait*," within which by the Statute of Gloucester an appeal of murder must be brought, was held to run not from the blow, but from the death, "for before that time no felony was committed." 2 Inst. 320. 1 Hale P. C. 427. And manslaughter arising out of a blow struck in one county, followed by death in another, was held by Mr. Justice Littledale to be a felony " begun in one county and completed in another," within the meaning of a modern English statute authorizing such a felony to be indicted in either county. *Rex* v. *Jones*, 1 Russell on Crimes, (3d Eng. ed.) 549, 550.

Whenever at common law murder escaped punishment at the place of the death, it was not from a want of authority in the government, but from a defect in the laws regulating the mode of prosecution and trial.

In the beginning of the reign of Edward III., according to Chief Justice Scrope, if a man died in one county of a wound received in another, the murderer might be indicted and arraigned in the county where the death happened, "and yet the cause of his death began in the other county." Fitz. Ab. Corone, 373. At a later period, it was held that where a man was feloniously stricken or poisoned in one county, and died in

another county, no indictment could be found in either county, because both the stroke and the death were necessary to constitute the crime, and the jurors of one county could not inquire of that which was done in another, "unless," as Lord Hale says, "specially enabled by act of parliament;" and for this reason the custom at one time prevailed of taking the dead body into the county where the mortal stroke was given, and having an indictment found and tried there; and, in carrying out the same principle, it was held that an appeal of murder, which required no indictment, but was sued out by the nearest relation, and prosecuted by the king only in case of the withdrawal of the appellant, might be brought in the county of the death, although the mortal stroke was given in another county, provided there were legal means of summoning a jury for the trial out of both counties, but not otherwise. 6 Hen. VII. 10, pl. 7. 3 Inst. 48, 49. 2 Hale P. C. 163. 1 Stark. Crim. Pl. 3, and notes.

The St. of 2 & 3 Edw. VI. *c.* 24, begins with declaring, "Forasmuch as the most necessary office and duty of law is to preserve and save the life of man, and condignly to punish such persons that unlawfully and wilfully murder, slay or destroy men," and, after reciting the defects in the previous laws, enacts, "for redress and punishment of which offences and safeguard of man's life," that "where any person or persons hereafter shall be feloniously stricken or poisoned in one county, and die of the same stroke or poisoning in another county, then an indictment thereof founden by jurors of the county where the death shall happen, whether it shall be founden before the coroner upon the sight of such dead body, or before the justices of peace or other justices or commissioners which shall have authority to inquire of such offences, shall be as good and effectual in the law, as if the stroke or poisoning had been committed and done in the same county where the party shall die, or where such indictment shall be so founden; any law or usage to the contrary notwithstanding." That statute, passed within a century before the settlement of Massachusetts, and manifestly suitable to our condition, would seem to have been part of our common law. *Commonwealth* v. *Knowlton,* 2 Mass. 534. *Re*

*port of the Judges*, 3 Binn. 595, 620. *State* v. *Moore*, 6 Foster, 448.

One of the very first statutes passed by the general court of the Province declared, as one of the rights and liberties of the people, that all trials should be by a jury "of the neighborhood and in the county or shire where the fact shall arise or grow." Prov. St. 4 W. & M. (1692), Anc. Chart. 114. That statute was indeed, because of other provisions therein, disallowed by the king in council under the power reserved in the Province Charter. But it is high evidence of the understanding of the people of the Province upon this question, and would seem to be as fully satisfied by a trial in any county in which the act continued to operate, as by a trial in the county in which it first began.

The thirteenth article of the Declaration of Rights established by the Constitution of the Commonwealth in 1780, declares that, "in criminal prosecutions, the verification of facts in the vicinity where they happen is one of the greatest securities of the life, liberty and property of the citizen." The St. of 1795, *c.* 45, § 1, (which substantially reënacted the St. of Edw. VI., adding to the cases of stroke or poisoning, "or injury,") was held by this court, in *Commonwealth* v. *Parker*, 2 Pick. 550, not to be inconsistent with that article; and Chief Justice Parker, in delivering judgment, said : "Murder is a complex term, denoting several facts, of which the death of the party is one of the most essential. The mortal stroke, or the administering of poison, does not constitute the crime, unless the sufferer dies thereof within a year and a day." 2 Pick. 558. That enactment has been embodied in the Rev. Sts. *c.* 133, § 8, and Gen. Sts. *c.* 171, § 18.

In the most ancient times of which we have any considerable records, the English courts of common law took jurisdiction of crimes committed at sea, both by English subjects and by foreigners. *Beufo* v. *Holtham*, 25 Edw. I. in Selden's Notes to Fortescue. *c.* 32. *Case of the Norman Master and English Seamen*, 40 Assis. 25; *S. C.* Fitz. Ab. Corone, 216 ; 13 Co. 53, 54. 2 Hale P. C. 12, 13, and notes, and cases cited. But after the admiralty jurisdiction had been settled by the Sts. of. 13 and 15

Ric. II., if a mortal stroke was given on the high sea, and the person stricken came to land in England and died there, then, according to the rule established before the St. of Edw. VI. in the case of two counties, the courts of common law could not try the murderer, because no jury could inquire of the stroke at sea, and the admiral could not try him, for want of authority to inquire of the death on land. 3 Inst. 48.

Both Lord Coke and Lord Hale, however, were of opinion that such a murderer could not wholly escape punishment, although they differed as to the mode of bringing him to justice.

It is indeed reported in 1 Leon. 270, that in the argument of *Lacye's case*, 25 Eliz., " it was said by Coke, and agreed by Wray [then chief justice of the queen's bench] that if a man be struck upon the high sea, whereof he dieth in another county afterwards, this murder is dispunishable, notwithstanding the St. of 2 Edw. VI." But no such point is stated in the other reports of the case by Sir Francis Moore and by Coke himself. Moore, 121. 2 Co. 93 *a.* 5 Co. 107 *a.* And Coke, in his own writings, positively asserts that if a man was mortally wounded in a foreign country or on the high seas, and died of the wound in England, the murderer might be tried in the court of the constable and marshal. Co. Lit. 74 *b.* 3 Inst. 48. This opinion appears to have been founded on a strained construction of the St. of 13 Ric. II. St. 1, *c.* 2, which declared that " to the constable it pertaineth to have cognizance of contracts and deeds of arms and of war out of the realm, and also of things that touch arms or war within the realm, which cannot be determined or discussed by the common law."

Lord Hale is clear that the constable and marshal administered the law martial only, and could not try such a case in time of peace. 1 Hale P. C. 500. 2 Hale P. C. 20. And in one or two passages of his Pleas of the Crown he speaks of it as *casus omissus.* 1 Hale P. C. 426. 2 Hale P. C. 163. But when treating of the question more directly, he shows that no decision of the point was had in *Lacye's case*, and expresses the opinion that such an offence might be tried in the courts of common law, especially if the stroke was upon the narrow seas, though out of the body of a county. 2 Hale P. C. 12–20.

In his Treatise on the Admiralty Jurisdiction, preserved among the Hargrave Manuscripts in the British Museum, he expresses the same opinion more positively, and with a much fuller statement of reasons. After speaking of *Lacye's case*, as reported in the various books, and quoting from 2 Co. 93 *a*, the statement that in that case " those of the county of York could not inquire of his death without inquiring of the stroke, and of the stroke they could not inquire, because it was not given within any county; and those of the admiral jurisdiction could not, as of a felony, inquire of the stroke without inquiring of the death, and they could not inquire of the death, because it was *infra corpus comitatus ;*" and mentioning the opinion of Lord Coke in 3 Inst. 48, that it was triable before the constable and marshal; he proceeds to state his own opinion, with the reasons for it, as follows : " But it rather seems that in this case the trial of the murder shall be at the common law, especially if the stroke were given, as in *Lacye's case*, in the narrow seas. 1. Because otherwise there would ensue a failure of justice, which cannot be presumed in so long a continuance of time. 2. Because anciently at common law criminal causes, even upon the high sea, were heard and determined in the king's bench upon an indictment in the adjacent county, as appears by the instances before given. 3. Because the jurisdiction of the common law is far more ancient than that of the admiralty, and the latter of no ancienter an addition than Edw. I. · 4. When the common law and admiralty come together, the common law takes place, and therefore since in this case both the stroke and the death make the felony, the death that is within the county shall, for necessity and to prevent a failure of justice, attract the trial of the whole offence to the common law. 5. The narrow seas are *infra ligeantiam domini regis* and part of his kingdom, and therefore the beginning of the offence being within the kingdom and *contra pacem regis*, though out of the county, and the consummation by the death being in the county, which completes the offence, the trial shall be at the common law. 6. And accordingly was the opinion of the court of king's bench in *Fulwood's case*, Mich. 13 Car "

This passage clearly shows that in the opinion of that great jurist, perhaps the highest authority in our criminal law, even a homicide beginning with a stroke upon the high seas, and consummated by death upon land within the realm, might be indicted and tried in the courts of common law in the county where the death took place, by virtue of their inherent general jurisdiction and to prevent a failure of justice. He does not suggest or intimate that this jurisdiction was limited to English subjects; and one of " the instances before given " by him is the *Case of the Norman Master and English Seamen,* already cited, in which, upon a conviction of all for piracy, even the Norman was adjudged guilty of felony and hanged, although, as Lord Coke tells us, " the Normans were not then under the obedience and allegiance of the king of England, (for King John lost Normandy,) and for that cause " the Norman could not be held guilty of treason and punished accordingly, as his English companions were. 13 Co. 53, 54.

In *Fulwood's case,* it was held that, although to constitute the offence of taking against her will and marrying any woman having lands or other property, which was made a felony by St. 3 Hen. VII. *c.* 2, there must be both a forcible taking and a marriage, yet, if the woman was forcibly taken in one county, and carried into another and there married, " it was a continuing force " in the second county, and might be there indicted. Cro. Car. 488. 1 Hale P. C. 660. Lord Hale's way of referring to this case, at the end of the passage above quoted from his Treatise on Admiralty Jurisdiction, shows that he considered the continuing operation of the mortal blow in the one case as within the same principle as the continuing restraint of the ravisher in the other. And there is earlier authority for the same view; for Lord Hobart says, " *Quære,* If the taking, and the lands, and the marrying were in several counties; for it is felony composed of all those three things, as murder is of the stroke and death." Hob. 183.

Neither Lord Coke nor Lord Hale suggests any doubt of the rightful power of the legislature to pass a statute to punish whoever should cause death within the realm by an injury on

the high seas. And in 1729 the parliament of Great Britain passed a statute, declared to be " for preventing any failure of justice and taking away all doubts touching the trial of murders in the cases hereinafter mentioned," by which it was enacted that, where any person should be feloniously stricken or poisoned upon the sea or at any place out of England, and should die of the same stroke or poisoning in England ; or where any person should be feloniously stricken or poisoned at any place in England, and should die of the same stroke or poisoning upon the sea or at any place out of England ; in either of said cases the offenders, both principals and accessories, might be indicted, tried, convicted and sentenced in the county in England in which such death, stroke or poisoning should happen respectively, with the same effect as if the felonious stroke and death thereby ensuing, or poisoning and death thereby ensuing, had happened in the same county. St. 2 Geo. II. *c.* 21. That statute did not extend to the Colonies, and was repealed by St. 9 Geo. IV. *c.* 31, § 1 ; and no suggestion appears to have been made, while it was in force, of its being limited in its application to British subjects. 4 Bl. Com. 303. 1 East P. C. 366. The only published exposition of it is in an opinion given by Sir James Marriott as advocate general, who, looking upon the subject in the view of the law of nations, wrote, " With respect to murders, when persons die in a foreign country of a wound received within this realm, or die in this realm of a wound received in a foreign country, in either alternative the party giving the wound, and his accessory or accessories, by St. 2 Geo. II. *c.* 21, must be tried in England, the statute considering the cause and effect as one continuity of action without interval, in order to found a domestic jurisdiction and to reach the crime." Forsyth's Opinions on Constitutional Law, 218. In *The King* v. *Farrel*, 1 W. Bl. 459, Lord Mansfield treated the question whether a murder by a mortal stroke on the high seas, from which death ensued in Ireland, was triable in Ireland, as depending upon the question whether there was any Irish statute upon the subject. In fact, the Irish St. of 10 Car. I. contained provisions similar to the English Sts. of Edw

VI. and Geo. II.   1 Gabbett's Crim. Law, 501.   Thus stood the law of the mother country at the time of the American Revolution.

The courts of the United States have held that a mortal stroke on the high seas, from which death ensues on land, either in a foreign country or within the United States, cannot be indicted under an act of congress providing for the punishment of murder or manslaughter on the high seas.   The reason was thus stated by Mr. Justice Washington, in the leading case : " The death, as well as the mortal stroke, must happen on the high seas, to constitute a murder there."   " The present is a case omitted in the law ; and the indictment cannot be sustained." " It would be inconsistent with common law notions to call it murder ; but congress, exercising the constitutional power to define felonies on the high seas, may certainly provide that a mortal stroke on the high sea, wherever the death may happen, shall be adjudged to be a felony."   *United States* v. *M' Gill*, 4 Dall. 427 ; *S. C.* 1 Wash. C. C. 463.   *United States* v. *Armstrong*, 2 Curtis C. C. 446.   Congress has accordingly passed statutes providing for the punishment, at first of murder only, and afterwards of manslaughter, by a blow, wound or poison on the high seas, or in any river or bay, within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular state, followed by death on land. U. S. Sts. 1825, *c.* 65, § 4 ; 1857, *c.* 116, § 1.

The legislature of the Commonwealth, from an earlier period, has asserted the right of punishing such crimes in the county where they take final effect by destroying life.   At February term 1795 of this court in Suffolk, a conviction of manslaughter at common law was had upon an indictment charging that Joseph Hood on the high seas mortally injured John Antony, by assaulting and beating him with a rope and a stave and his hands and feet, and exposing him without sufficient covering to the cold, winds and storms, and depriving him of necessary food, of all which injuries he languished on the high seas and at Boston in said county, and died at Boston.   At August term 1795 judgment was arrested, upon the ground that the indict-

ment charged that the cause of death arose on the high seas and not within the jurisdiction of this court. *Hood's case*, Rec. 1795, fol. 216, and papers on file. It was to cure the defect thus declared to exist in our law, that the legislature at its next session, on the 15th of February 1796, passed the St. of 1795, *c.* 45, § 2, by which it was enacted that " where any person hereafter shall be feloniously stricken, poisoned or injured, on the high seas and without the limits of this Commonwealth, and die of the same stroke, poisoning or injury in any county thereof, that then an indictment thereof, found by the grand jurors of the county where the death shall happen, before the justices of the supreme judicial court there held, shall be as good and effectual in law as if the stroke had been given or the poisoning or injury done in the same county where the party shall die." By later statutes, all indictments are returned into the lower court. *Webster* v. *Commonwealth*, 5 Cush. 386. Gen. Sts. *c.* 171, §§ 1 *& seq.*, 21 *& seq.* But the substance of this provision, omitting the word " feloniously " (which might be somewhat difficult of application to an act not done under laws of which our courts have judicial knowledge) and extended to cases in which the mortal wound or injury is given on land without the limits of the Commonwealth, has been embodied in the Rev. Sts. *c.* 133, § 9, and thence, with merely verbal changes, in the Gen. Sts. *c.* 171, § 19, on which this indictment is founded. Neither of these statutes appears to have been made the subject of judicial exposition. But a law which has been kept on the statute book for such a length of time by repeated enactments is not to be lightly declared invalid for exceeding the legislative power. And it comes within the principle by which the preceding section, relating to death resulting in one county from an unlawful act in another, was held valid in *Commonwealth* v. *Parker*, 2 Pick. 550, before cited.

A similar enactment, adding, after " high seas," " or on any other navigable waters," has been sustained upon full argument and consideration by the supreme court of Michigan. *Tyler* v. *People*, 8 Mich. 320. That was the case of an indictment upon a statute, apparently taken from our own Revised Statutes, in-

Commonwealth *v.* Macloon & others.

serting only after the words " on the high seas," the words " or on any other navigable waters." The majority of the court held that the statute was constitutional, and applied to a case in which the mortal blow was struck on a navigable fresh water river within the boundaries of Canada and the man died within the state of Michigan ; saying, " We think it clearly within the scope of the legislative power. The expediency or policy of the statute has nothing to do with its constitutionality ; and if it was a legitimate sub·rct of inquiry and consideration in determining the constitutional question, we should not hesitate in the present instance to declare in its favor ; for the crime, though commenced in Canada, was consummated in Michigan. The shooting itself, and the wound which was its immediate consequence, did not constitute the offence of which the prisoner is convicted. Had death not ensued, he would have been guilty of an assault and battery, not murder, and would have been criminally accountable to the laws of Canada only. But the consequences of the shooting were not confined to Canada. They followed Jones into Michigan, where they continued to operate until the crime was consummated in his death. If such a killing did not by the common law constitute murder in Michigan, we think it the clear intent of the statute to make it such, to the same extent as if the wounding and the death had both occurred in the state." 8 Mich. 333, 334.

The able and learned dissenting opinion of Mr. Justice Campbell proceeds upon the ground that no part of the criminal act of the defendant was done at the place of the death, a position which seems to us to be untenable for the reasons already stated, and the ingenious arguments and illustrations adduced in support of which will not stand a critical examination.

The argument that, in order to constitute unlawful homicide, the person killed must be " in the king's peace," is fully answered by the passage above quoted from the judgment of the majority of the court. The person killed was at the time of his death within the jurisdiction and protection of the state under whose laws the person who killed him was indicted.

It is then said that " the slayer must also, under all the au·

thorities, owe temporary or permanent allegiance to the sover-
eign," and be " under the peace," that is to say, " under the
protection of the king."   But this position is inconsistent with
the doctrine universally recognized, and afterwards admitted by
the learned judge himself, that one who, standing out of the
jurisdiction, shoots and kills a man within it, is indictable for
the homicide where his shot strikes and kills.   And in all the
cases but one, cited in support of this position, both the stroke
and the death took place out of the realm.   In *Rex* v. *Sawyer*, 2
C. & K. 101 ;  *S. C.* Russ. & Ry. 294 ; it was held that a British
subject might be tried in England under St. 33 Hen. VIII. *c.*
23, for the murder of another British subject, committed on land
in a foreign independent kingdom, upon an indictment alleging
that the person murdered was in the peace of the king, and that
the murder was committed against the peace of the king.   In
*Regina* v. *Serva*, 2 C. & K. 53 ;  *S. C.* 1 Denison, 104 ; it was
held that a murder by a foreigner on a foreign ship, resulting
in immediate death, was not triable in England.   In *The King*
v. *Depardo*, 1 Taunt. 26, *Rex* v. *Helsham*, 4 C. & P. 394, and
*Rex* v. *Mattos*, 7 C. & P. 458, it was held that a murder by a
wound on land in a foreign country, of which the person
wounded died there or on board of a British ship, could not be
punished in England without proof that the murderer was a
British subject.   The remaining case is that in which the killing
of a man attainted by *præmunire*, and so out of the king's pro-
tection, was held not to be felony ; for which are quoted 1 Hale
P. C. 433, and Vin. Ab. Murder, B, 3.   But a reference to the
original authorities there cited deprives the case of any weight.
The Statutes of Præmunire declared any one attainted by
*præmunire* to " be put out of the king's protection."   Sts. 16
Ric. II. *c.* 5 ; 24 Hen. VIII. *c.* 12, § 4.   And it is therefore
said to have been held in parliament in 24 Hen. VIII. that the
killing of such a person was not felony, because it was " as
if he was out of the kingdom and power of the king."   Bro.
Ab. Corone, 197.   But within thirty years afterwards it was
declared by St. 5 Eliz. *c.* 1, § 18, that this was doubtful, and
that it should be unlawful to kill such a person, " any law or

statute, or opinion or exposition of any law or statute, to the contrary in any wise notwithstanding."

It is further asserted that " there are very high authorities for saying that at common law a trial might always be had in the county where the mortal blow was given, for that alone is the act of the party, and the death is but a consequence ; " for which are cited 1 East P. C. 361, 1 Hale P. C. 426, and 1 Bishop's Crim. Law, § 454. But both Lord Hale and Mr. East are speaking only of the " more common opinion " before the St. of 2 & 3 Edw. VI. *c.* 24 ; and the words " that alone is the act of the party " are an addition of Mr. East, not to be found in Lord Hale, who immediately afterwards says, " On the other side, as to some respects, the law regards the death as the consummation of the crime, and not merely the stroke," of which he gives several illustrations, besides some already mentioned in the earlier part of this opinion.

The other authorities which Mr. Justice Campbell cites relate to the rule in cases of forfeiture for felony, the form of indictments against abettors, and the effect of a pardon between the blow and the death. The learned judge says that " perhaps the most reliable rule can be drawn from the decisions relating to forfeitures for felony." It is true that the books state that the escheat of the land of a murderer related to the time of the mortal wound, and not merely to that of the death; but this was only to avoid intervening alienations or incumbrances by the felon. 1 Hale P. C. 360, 426, 591. Vin. Ab. Forfeiture, R. It is also true that, where the stroke and the death are laid on different days, the abetment, if laid specially, should be applied to the stroke and not to the death; but an allegation that the abettors were present aiding and abetting at the time of the murder committed, to wit, on the first day, is fatally repugnant, for the reason that until the death no murder was committed. 1 Stark. Crim. Pl. 82. *Heydon's case,* 4 Co. 42. If the ruling of Mr. Justice Patteson in *Rex* v. *Hargrave,* 5 C. & P. 170, that an indictment for manslaughter was good, which charged that the mortal blow was given in one county and the person stricken languished and died in another, and the defendant " was then

and there present, aiding and abetting," &c., " in the commission
of said felony," is consistent with this, the words attributed to
him by the reporter, that " the giving of the blows which caused
the death constitutes the felony," and that " the languishing is
not any part of the offence," clearly are not. It was indeed held
in *Cole's case*, Plow. 401, that a general pardon after the mortal
wound and before the death was a bar to an indictment for the
murder. But that was not because the felony was committed at
the time of the wound and before the death, but " because the
wound given by the prisoner was the cause of the felony, the
giving of which wound was an offence and misdemeanor against
the queen, and that being pardoned by the act, all the conse-
quences that followed from the said offence are also pardoned
thereby." And it is settled by later authorities that a pardon
or conviction of the assault before the death is no bar to an
indictment for the murder after the death has completed the
greater crime. *Nicholas's case*, Foster, 64. *Commonwealth* v.
*Roby*, 12 Pick. 496. *The Queen* v. *Morris*, Law Rep. 1 C. C. 90.

The most plausible form of the argument against the juris-
diction is, that the coming into the state is the act not of the
wrongdoer, but of the injured person, and therefore should not
subject the former to the jurisdiction, merely because the latter
happens to die there. But it is the nature and the right of
every man to move about at his pleasure, except so far as re-
strained by law ; and whoever gives him a mortal blow assumes
the risk of this, and in the view of the law, as in that of morals,
takes his life wherever he happens to die of that wound ; and
may be there punished if the laws of the country have been so
framed as to cover such a case.

In *State* v. *Carter*, 3 Dutcher, 499, the supreme court of New
Jersey held that a man could not be indicted in that state for
manslaughter by mortal bruises given in New York, of which
the person injured died in New Jersey. But the only statute of
that state upon the subject, as was observed by Mr. Justice
Vredenburgh in delivering the judgment of the court, evidently
relates to murder only, and not to manslaughter. His remarks
upon the power of the legislature of New Jersey to provide for

the punishment of such a case are therefore purely *obiter dicta;* and they are unsupported by any reference to authorities, and present no considerations which require further discussion.

*Grosvenor* v. *St. Augustine,* 12 East, 244, was not a criminal case, but in the nature of an action against the hundred on the St. of 19 Geo. II. *c.* 34, § 6, which provided that if any officer of the revenue should be beaten, wounded, maimed or killed by a smuggler, the inhabitants of the lath in such counties as were divided into laths, and in other counties the inhabitants of the hundred, " where such fact shall be committed," should pay all damages suffered by such beating, wounding or maiming, and one hundred pounds to the executor or administrator of each person so killed. It was indeed held that this penalty might be recovered by the executor of a revenue officer who received a mortal wound in a boat between high and low water mark, of which he afterwards died on the high sea, by a shot fired from the shore within the lath. But that was upon the construction of the particular statute, as appears from Lord Ellenborough's judgment. " The shot which produced the death, having been fired from the shore within the lath, brings the case *within the fair meaning of the act, the object of which was to* make the inhabitants of that place where the act was done which caused the death answerable for it, in order to interest them in repressing the offences against which the act was levelled." All the authorities agree that the mere fact of the shot being fired from the shore would not give the courts of common law jurisdiction of an indictment for homicide. *Rex* v. *Coombes,* 2 Leach, (4th ed.) 388. 2 Chalmers Opinions, 217. *United States* v. *Davis,* 2 Sumner, 485.

The learned counsel for the defendants much relied on the case of *Regina* v. *Lewis,* Dearsly & Bell, 182; *S. C.* 7 Cox Crim. Cas. 277. That was an indictment on the St. of 9 Geo. IV. *c.* 31, § 8, which was held not to cover the case of a foreigner dying in England from injuries inflicted by another foreigner in a foreign vessel upon the high seas. But, although at the argument two of the judges, Mr. Justice Coleridge and Mr. Baron Martin, expressed doubts whether parliament could legislate for

the punishment of such a crime, none of the judges except Mr. Justice Crompton denied the power; Lord Chief Justice Cockburn suggested that the section under which the indictment was found, taken in ·connection with the next preceding section, relating to murder or manslaughter in a foreign country, which was in terms limited to British subjects, must be equally limited; and after advisement the opinion of the court was put upon that ground only. The case of *Nga Hoong* v. *The Queen*, 7 Cox Crim. Cas. 489, was decided upon like considerations. Both of those cases, therefore, merely held that the whole tenor of the statute in question showed that it was not intended to cover cases of foreigners sailing on the high seas under a foreign flag; applying the same rule of construction as the supreme court of the United States in *United States* v. *Palmer*, 3 Wheat. 631–634, and *United States* v. *Pirates*, 5 Wheat. 195–197. Whether an explicit statute of the state where a murdered man dies will warrant the indictment and trial of his murderer if found within the jurisdiction is quite a different question.

Neither of the statutes of the Commonwealth upon this subject has ever contained any words limiting the description of the persons by whom the offence might be committed; and the existing statute clearly manifests the intention of the legislature to punish all who without legal justification cause the death of any person within the Commonwealth, wherever the first wrongful act is done, or of whatever country the wrongdoer is a citizen. The power of the Commonwealth to punish the causing of death within its jurisdiction is wholly independent of the power of the United States, or of the nation to which the vessel beongs, to punish the inflicting of the injury on the high seas. And upon full consideration the court is unanimously of opinion that there is nothing in the Constitution or laws of the United States, the law of nations, or the Constitution of the Commonwealth, to restrain the legislature from enacting such a statute.

The other objections of the defendants may be more briefly disposed of. The only ones insisted on in argument were that the statute included, among the causes of death, nothing but

poison, and blows or other violent acts, and not injuries by ex-
posure, starvation or neglect; that the indictment should have
alleged in terms that the wounds and other causes of death
therein mentioned were "mortal;" that it was bad for duplicity,
because it charged a beating, an exposure and a starving, as
the means of death; that, if not bad for duplicity, all the coöp-
erating causes alleged must be proved; and that the defendants
could not be charged and convicted of manslaughter by reason
of an injury done by one of them to the deceased on one day,
and another injury done to him by another of them on a differ-
ent day.    The court is of opinion that neither of these objec-
tions can be sustained.

The language of the statutes of Massachusetts upon this sub-
ject is not, like that of the English statutes, limited to the cases
of a blow struck or poison given, but would seem to have been
carefully framed, in the light of *Hood's case*, before cited, to
exclude the construction contended for.    The St. of 1795 enu-
merated as causes of death "stroke, poisoning or injury," and
the later reënactments speak of a mortal wound given, "or
other violence or injury inflicted," or poison administered.
"Inflict" does not necessarily imply direct violence.    There is
no more appropriate use of the word "inflict" than in con-
nection with punishment; and "to inflict punishment" clearly
includes imprisonment and involuntary restraint, as well as
hanging, beheading or whipping.    We can have no doubt that
any bodily harm which is caused to be suffered by the act of
the accused is an "injury inflicted," within the meaning of the
statute.

The objections to the form of the indictment are both an-
swered by the consideration that it is not framed upon the
theory that either of the means alleged alone was necessarily
the cause of the death, but upon the theory that the blows, the
starving and the exposure coöperated to produce it.    In such a
case, it is abundantly established by precedents that it is suffi-
cient to allege that the death resulted from all these means,
without otherwise alleging either of them to have been mortal,
and to prove that it resulted from all or any of them.    2 West's

Simb. §§ 301, 308. *Weston's case*, 3 Inst. 50, 135. *Jackson's case*, 18 Howell's State Trials, 1075, 1111. 2 Hawk. *c.* 23, § 83. *The King* v. *Clark*, 1 Brod. & Bing. 473. *Commonwealth* v. *Stafford*, 12 Cush. 619. The only color for the position that all the coöperating causes alleged as tending to one result must be proved is to be found in the doubt of one learned judge, and the *dictum* of another, at *nisi prius*. *Stockdale's case*, 2 Lewin, 220. *Rex* v. *Saunders*, 7 C. & P. 277.

The instructions given to the jury in this case did not allow them to convict any one of the defendants who did not take part in the act or acts which they found to have caused the death; and were more favorable to the defendants than the charge of Sir Michael Foster in *Jackson's case*, above cited.

*Exceptions overruled.*