# CHARLESTON.

## McNEELEY *ex parte*.

Submitted January 21, 1892.—Decided February 6, 1892.

1. CONSTITUTIONAL LAW—HOMICIDE AND POISONING—DEATH IN ONE STATE FROM WOUND INFLICTED IN ANOTHER.

The latter clause of section 6, c. 144, of the Code (1891) providing that, "if a person be stricken or poisoned out of this State, and die by reason thereof within this State, the offender shall be as guilty and may be prosecuted and punished, as if the mortal stroke had been given or poison administered in the county in which the person so stricken or poisoned may so die," is not unconstitutional or invalid.

2. CONSTITUTIONAL LAW.

Section 3 of article 3 and amendment 6 of the constitution of the United States apply to offences against the United States and proceedings in its courts, and not to offences against a State or proceedings therefor in the State courts.

3. CRIMINAL PROCEEDINGS—TRIAL.
    Crime committed partly in one State, partly in another; partly in one county, partly in another. Place of trial discussed.

4. CRIMINAL PROCEEDINGS—TRIAL.
    Clause of constitution that trial shall be in county where offence committed discussed.

*Vinson & McDonald* for plaintiff in error cited 3 Wheat. 374; 12 Pet. 657; 67 Am. Dec. 413; 86 Am. Dec. 252; 2 Am. & Eng. Ency. Law 504; 1 Gratt. 655; 22 W. Va. 800; 21 W. Va. 781.

*Attorney-General Alfred Caldwell* for the State cited Code (1860) c. 1, s, 6; Const. Art. II, s. 1; Code (1891) c. 1, s. 2; Id. c. 144, s. 6; Id. c. 152, ss. 11, 13; Acts 1839-40, c. 59, s. 2; Acts 1847-8, p. 96, ss. 7, 8; Id. p. 122, s. 6; Mat. Cr. Dig. 113, 114; Acts 1882, c. 118; Const. Art. III, s. 14; 138 U. S. 157, 181; 1 Bail. 283; 7 Vt. 118; 21 Ia. 467; 119 U. S. 437; 5 How. 410; 7 Pet. 243; 2 Hawk. P. C. §§ 36, 37; Rev. Stat. U. S. §§ 5339, 731, 732; 1 Russ. Cr. 432, 433; 2 Va. Cas. 205; 2 Pick. 558; 38 Ark. 568; 8 Mich. 326; 101 Mass. 1; 10 N. J. L. 495; 1 Whar. Cr. L. (8th Ed.) § 292; 106 Ind. 426; 15 Neb. 484; 12 Lea 721; 1 Mack. 498; 16 S. C. 624; 13 Tex. App. 289; 66 Ala. 40; 9 Bax. 362; 55 Ia. 406; 46 Mich. 268; 52 Wis. 217; 82 N. Y. 235; 63 Ga. 513; 4 Dall. 426; 2 Curt. 446; 127 U. S. 700; 9 B. & C. 446.

BRANNON, J :

Stuart McNeeley filed his petition in July, 1891, in the Circuit Court of Logan County, praying for a writ of *habeas corpus* to discharge him from the jail of that county, and upon demurrer the court refused to award the writ, and dismissed the petition, from which action of the court he has obtained this writ of error.

The petition states that in 1891 Frank Hurley died from gunshot wounds inflicted by McNeeley while both were in the State of Kentucky, standing between high and low water marks, about ten feet above the water's edge, on the Kentucky side of the Tug Fork of Big Sandy river, formerly called the "East Fork;" that Hurley died in Logan county; that McNeeley is confined in the jail of Logan

county upon criminal process issued by a justice of that county to answer for the murder of Hurley; that the State of West Virginia has no jurisdiction over said offence, because it was committed in Kentucky; and it prays that a writ of *habeas corpus* issue for his relief, and that he be discharged from custody. The petition does not state anything as to McNeeley's citizenship.

The boundary line in that locality between the States of West Virginia and Kentucky is as it was between Virginia and Kentucky at the date of the formation of West Virginia. Const. W. Va. art. 2, § 1; Code Va. 1860, c. 1, § 6. The stream called "Tug Fork" is here the boundary, and the line between the States is its middle. *Handly's Lessee v. Anthony*, 5 Wheat. 374; 1 Bish. Crim. Law, § 150. I think it clear that the mortal blow was given within the territory of Kentucky. But Hurley died within the territory of West Virginia; and under our Code, though the mortal blow was given in Kentucky, this State has jurisdiction to try McNeeley, if the provision be valid.

Chapter 144, § 6 is as follows: "If a person be stricken or poisoned in, and die by reason thereof out of, this State, the offender shall be as guilty, and be prosecuted and punished, as if the death had occurred in the county in which the mortal stroke or poison was given or administered. And if any person be stricken or poisoned out of this State and die by reason thereof within this State, the offender shall be as guilty, and may be prosecuted and punished, as if the mortal stroke had been given, or the poison administered, in the county in which the person so stricken or poisoned may so die."

It is relied upon as a chief point in the prisoner's case that the latter clause of said Code section is in violation of section 14, art. III. of the State constitution, and section 3, art. III. of the Federal constitution. Section 14, art. III. of the State constitution provides that the trials of crimes shall be "in the county where the alleged offence was committed." This raises the question, where was this offence committed, in a legal point of view—in Kentucky, where the bullet struck its victim, or in West Virginia, where he died? We must look to the common-law to answer this

outside the statute. The ancient common-law is said to have propounded the very unreasonable principle that, if a person be wounded in one county, and die in another, his murderer could be tried in neither. 1 Hawk. P. C. c. 13, § 13, thus states it : "It is said by some that the death of one who died in one county of the wound given in another was not indictable at all at common-law, because the offence was not complete in either county, and the jury could only inqure of what happened in their own county. But it has been holden by others that, if the corpse had been carried into the county where the stroke was given, the whole might be inquired of by a jury of the same county." In volume 2 c. 25, § 36, Hawkins states that as the more general opinion.

Chitty says, in 1 Crim. Law, *178, that where the blow and death were in different counties "it was doubted" whether the murderer could be punished in either.

Blackstone says he could be punished in either county. Bl. Comm. bk. 3, p. 303.

But that great English authority on criminal law, Lord Hale, vindicates the ancient common-law from this reproach, saying: "At common-law, if a man had been stricken in one county and died in another, it was doubtful whether he were indictable or triable in either; but the more common opinion was that he might be indicted where the stroke was given, for the death is but a consequence, and might be found, though in another county." So says East, (1 P. C. c. 5, § 128.)

In *John Lang's Case,* Y. B. 6 Hen. VII. p. 10 (A. D. 1490) where the blow and death were in different counties, the court said: "In this case it hath been used after the death to bring the dead man, to wit, the body, into the county where he was struck, and then to inquire and find that he was struck and died of that." And in a case in 1491, TREMAILLE, J., said, where the blow and death were in different counties: "It seems it is not material where he died, for the striking is the principal point; but it requires death, otherwise it is no felony; but whether he died in one place or another is not material." Y. B. 7 Hen. VII. p. 8.

Abbott, C. J., in *Rex* v. *Burdett*, 4 Barn. & Ald. 169, held Hale's authority as superior in this matter.

Wharton, in 1 Crim. Law, § 292, says: "By the early English common-law the place where the mortal stroke was given had jurisdiction in cases of homicide. As there seemed, however, to be doubts in the cases in which the blow was in one jurisdiction and the death in another, the statute 2 & 3 Edw. VI. c. 24, was passed, the effect of which, though inartificially drawn, is to give the place of death jurisdiction. This statute has been held to be part of the common-law in several States in this country; but even where it is in force it does not, according to the better opinion, divest the jurisdiction of the place where the blow was struck." 1 Bish. Crim. Proc. § 52. I think the proposition that the prosecution may be where the blow is given, no matter where the death, was the rule under the ancient common-law, and certainly under the modern common-law as held in American courts. The true view is that the blow is murder or not, according as it produces death or not within a year and a day; and in all cases an indictment lies in the county where the blow was given. Id. § 51.

President Garfield received his wound in the District of Columbia, but died in New Jersey; and under a statute that any one "who commits murder within any fort, arsenal, magazine, dock-yard, or any other place or district or country under the exclusive jurisdiction of the United States, * * * shall suffer death," it was contended that to say one commits murder within a district the blow and death must both take place there, but on full consideration it was held that the crime was committed within the District, because the blow wast here. *Guiteau's Case*, 47 Amer. Rep. 247.

In *Riley* v. *State*, 9 Humph. 646, where the death and blow were in different counties, the Tennessee court, under a statute providing that trial should "be in the county where the offence may have been committed," said it repealed the statute of 2 & 3 Edw. VI., that the blow was the offence, the death the mere result; and that it never was the rule under the old common-law that

where death and blow were in different counties, the trial could be in neither, and the trial must be in the county where the blow was given.

In *Green* v. *State*, 66 Ala. 40, it was held that a statute authorizing prosecution for murder in the county where the blow was struck, though death was out of the State, was valid; the court saying that the wound was the offence, death a sequence, rather than a constituent elemental part, of the crime, and that without the statute the State had jurisdiction.

In *State* v. *Gessert*, 21 Minn. 369, a person was stabbed in Minnesota, and died in Wisconsin, and it was held that the death in Wisconsin was only a consequence of the act committed against Minnesota, and he was triable there. It was not based on a statute.

In *State* v. *Kelly*, 76 Me. 331, the doctrine is asserted as common-law that where the blow is given is where the crime is committed.

*People* v. *Gill*, 6 Cal. 637, holds the crime is where the blow is, and where the place of trial is changed after the blow by law it must be at the place fixed by law at date of blow.

In *State* v. *Bowen*, 16 Kan. 475, where the indictment did not charge death to have occurred in the State, where there was no statute on the question, BREWER, J., said that, as the only act the defendant does towards the death is giving the blow, that place is the place where he commits the crime, and that the subsequent wanderings of the wounded man, uninfluenced by the defendant, do not change the place of the offence; that death simply determines the character of the crime in giving the blows, and refers back to the act, and gives it quality.

The *Case of Linton*, 2 Va. 205, is said in *Hunter* v. *State*, 40 N. J. Law, 514, to be the only case holding that where a blow is given in one State, followed by death in another, there can be no prosecution in the State of the blow. No reasons are given by the court. I do not see how that decision was reached, except on the untenable ground of the alleged rule of the old common-law that, where the blow is in one county, death in another, neither can try the case;

by parity of reasoning where blow is in one State, death in another, the State where the blow was given can not prosecute. That must have been the reason, as Hawkins and Chitty, referring to that rule, are cited, and Blackstone, Hale and East, denying it, are not referred to. The statute 2 & 3 Edw. VI., to remove the doubt about that rule, was not then in force, all British statutes having been repealed by the act of 27th December, 1792. 1 Tuck. Bl. Comm. 8; 1 Rev. Code, 1819, c. 40. The fact that it is the place of the blow where the crime is committed is further sustained by the well-settled proposition that there can be no prosecution at the place of death merely, unless a statute authorizes it. 1 Whart. Crim. Law, § 292.

The said statute of Edward was in force in Virginia under the ordinance in convention in May, 1776, declaring operative in Virginia all acts of the English parliament of a general nature, not local to great Britain, passed since the fourth year of the reign of King James I., when the Virginia bill of rights of June 12, 1776, was adopted; and it may be said that, as the statute of Edward allowed a prosecution in the county of death, thus making that county, in a legal sense, the county where the offence was committed, we must interpret the constitutional clause in question by the light of that statute.

If the Virginia bill of rights, which remained unchanged down to the formation of this State, had used the word "county," as does ours, there would be force in the suggestion greater than there is; but it provided that an accused should be tried by a "jury of his vicinage." Blackstone, in book 3, p. 350, merely remarks that the word "visne," from which juries were drawn at common-law, was interpreted to mean "county." This word "vicinage," borrowed from old common-law, is not defined in Bouvier or Black in their law dictionaries as meaning "county," but "neighborhood, vicinity." It did not mean "county." In discussing the matter *de quo vicineto*—out of what neighborhood—the jury shall come, 3 Co. Litt. 464, states that it must be "of that town, parish, or hamlet, or place known out of the town, *etc.*, within the record, within which the matter of fact issuable is alleged, which is most certain and

nearest thereunto, the inhabitants whereof may. have the better and more certain knowledge of the fact."

Chitty (1 Crim. Law, 500) says the jury at common-law must come "from the very *ville* or place where the offence was committed," and that there was a challenge for want of hundreders on the jury.

Far back, under the common-law, murders were tried just where they occurred, by close neighbors, acquainted with the facts, as jurors upon view of the body (*super visum corporis.*) That the vicinage was the neighborhood, not the county, is plain from Proff. Jury, § 80, and Thomp. Trials, § 1. So it will appear from Hargrave's note to 3 Co. Litt. 464, where it will also appear that, while,a statute in Anne's reign altered this in civil cases, allowing the jury from the body of the county, it remained unaltered in criminal cases when Hargrave wrote the note, and was not changed as to felonies until 6 Geo. IV. c. 50, § 13 ; the 24 Geo. II. c. 18, only applying to actions on penal statutes.

Thus at the date of the adoption of the Virginia bill of rights "vicinage" meant "neighborhood," "vicinity;" not "county." Judge GREEN so thought, for in the opinion in *State* v. *Love*, 21 W. Va. 788, he says the word "vicinage," as used in the Virginia bill of rights, meant "vicinity ;" and was not the equivalent of "county ;" and he ventures the opinion that under it the statute allowing a trial in either county, where an offence occurred within 100 yards of a line between two counties, would be constitutional, but not so under our constitution.

The Massachusetts court, in *Com.* v. *Parker*, 2 Pick. 550, held that, where the constitution used the word "vicinity" in providing for the place of trial it was not equivalent to "county."

My own investigation of the old common-law books brings me to the same conclusion with Judge GREEN. Therefore, no light upon the construction of the clause in question in our constitution is shed by the statute 2 & 3 Edw. VI. When our constitution was adopted, that statute was not law, because of the repeal of English acts in 1792 ; and, if that act had not repealed it, the closing chapter of the Code of 1849 would have done so.

Again, I doubt whether the statute of Edward would apply anyhow, because it provided only, the blow and death both being in the kingdom, but in different counties, that the county of death might take jurisdiction, not applying to the case where the blow was out of the kingdom but the death within; and that this is so is apparent from the fact that parliament passed a statute in second year of Geo. II., providing where trial should be where blow and death happened, the one or the other, outside the kingdom. 1 Hawk. P. C. 94; 1 Chit. Crim. Law, *179. The case of a thief carrying goods from county to county or from State to State, and punishable in either, is not analogous. He himself, every moment, everywhere he goes, is actively committing crime.

Thus, I should think, as at common-law the place of the mortal stroke is the place where the offence is committed, and the place of death is not, and can only be made the place of trial by statute, when our constitution guaranties a trial in the county where the offence is committed it means the place where the stroke was given. Then can a State punish an act done outside its territory? It seems to be an axiom that a State's criminal law is of no force beyond its limits. Whart. Confl. Laws, § 18; Story, Confl. Laws, § 621; 1 Bish. Crim. Law, § 110. Story, J., said in The Apollen, 9 Wheat. 362, that laws of a country "must always be restricted in construction to places and persons upon whom the legislature have authority and jurisdiction." It can be asserted that a crime committed in another country, and in violation of its laws, can not, by legislative fiction or construction, be considered an offence in another country.

This doctrine does not, however, apply to cases where a crime is perpetrated partly in one and partly in another country, provided, as Mr. Bishop says, "what is done in the country which takes jurisdiction is a substantial act of wrong, not merely some incidental thing, innocent in itself alone." But this brings us back to the same question again.

The American states are distinct and separate, as between themselves, as to the administration of criminal law.

Wherein a State assumes criminal jurisdictions over crimes done within another it would seem to be without power. If Hurley had died in Kentucky, could this State try McNeeley, even if she had a statute extending so far? Could she thus exercise power over soil, persons, and acts without her territorial limits?

There are two lines of reasoning applicable to this case. One is that, while the blow is the beginning in the criminal transaction, it is only the beginning. The wound is because of the wrong in planting the bullet in the body, that wrong yet operating towards the consummation, which is the death; that the prisoner's agency is yet active in all this, in the languishing, in the decay of the physical strength, in the dying by reason of his wrong that started the process ending in death; and that its energy ceased not for a moment until death; and that this caused the death.

The other is that the shot that planted the bullet is the wrong. With it the prisoner's action began and ended. The suffering and dying are acts not his, but acts of the deceased; mere consequences or results of his act. He is answerable only because he started the force causing death; that he struck no blow in this State, and committed no breach of her peace or sovereignty.

The former view is ably held in *Com.* v. *Macloon,* 101 Mass. 1, *Tyler* v. *People,* 8 Mich. 320, and *Com.* v. *Parker,* 2 Pick. 550; while the latter view is held in 1 Bish. Crim. Law, §§ 112–116, and Bish. Crim. Proc. §§ 51, 52, and *State* v. *Carter,* 27 N. J. Law, 500.

I must, for myself, say that I have not been able to relieve myself from serious doubt as to the validity of the second clause of section 6, c. 144, Code, subjecting to punishment here a person striking a blow outside of this State; where the consequent death occurs within this State, because I regard the crime as committed where the mortal wound is inflicted. Under this statute, a man dealing a blow in California or Australia, if the stricken person comes here and dies, may be tried here, far away from the scene of the tragedy, where his character is known, far away from friends to aid in his defence, far away from the witnesses of the act, with no power in this State to compel the

attendance of those witnesses. The law of California or Australia may punish the act under the same facts in a certain way; ours with more severity. Does the prisoner know of our law when he strikes the blow? Is he bound to know our law? He is not. Neither in fact does he know, nor in theory is he bound to know, our law when he delivers the blow. He can not tell into which one of the many countries of the earth the victim may wander within the year and day before death, and he can not study the laws of all States.

True, the State may as much need witnesses from the place of death to prove death and dying declarations, but the prosecuting need is not to be compared to his need; and the State has subordinated her convenience and facility of prosecution by guarantying him by her laws compulsory process for evidence and trial in the county where the offence is committed.

I can not see very clearly that the man from California or Australia has a trial in the county where the offence is committed. Mr. Bishop in reasoning against the enforcement of such laws, says it is not a question of constitutional law, but that such laws ought to be construed in harmony with the law of nations, and their enforcement denied, except as to our own citizens. This is not without force. It may be said with some plausibility that the constitutional provision applies only where both blow and death occur within the State, and only selects what county shall hold the trial; and that it does not apply where part of the offence is outside the State. But I regard it a question of jurisdiction arising under the constitution; and that nowhere in the State can trial be had except in that county where the offence is committed, and if not enough of the act occurred in the county of death to enable us to say that the offence was committed there, then it has no jurisdiction, nor has any county in the State; for I construe the clause as meant to be co-extensive with all criminal acts justiciable under the power of the State.

Mr. Bishop, the great author, while resisting such statutes with reasoning which seems to me very strong and satisfactory, yet says that the question is not one of consti-

tutional law, but one of international law; and properly
admits that, if a legislature command a court to violate in-
ternational law, it is bound to do so. See Endl. Interp. St.
§ 175. If, then, he is right and the question is not one of
constitutional law, this Court can not, on his theory, re-
fuse to execute this law.

Virginia, as far back as 1840, enacted that if a blow
be given in the State, and death result in another State,
prosecution might be in Virginia, in the county of the
blow; but, though her criminal law has undergone
several revisions and though England and several of the
States of this Union had legislation punishing as mur-
der cases were the blow was without but death within
England or the State, Virginia has never adopted it. Did
she doubt its validity? It was inserted in our Code in
1882. But, though I have doubts on the subject, we must
not forget that the legislature, composed of many men of
legal ability and learning, and vested by the people with
the law-making power of the State, has approved this pro-
vision. A court must be slow and cautious to overthrow
its action. In none but a case of very plain infraction of
the constitution, where there is no escape, will or ought a
court to do so. To doubt only is to affirm the validity of
its action. I resolve my doubt in this way.

I shall add that I find no case directly holding such leg-
islation void, though a number of cases afford ground for
logical deduction to that effect. They are cited above. But
there are two cases asserting its validity. In *Tyler* v. *Peo-
ple*, 8 Mich. 320, a man was punished in Michigan under
such an act for a blow dealt in Canada, one judge dissent-
ing; and in *Macloon's Case*, 101 Mass. 1, a British subject
and a citizen of Maine were convicted for murder where
the act was on a British vessel at sea, but the party died in
Massachusetts. Though not the point of decision, it is con-
ceded that such legislation is valid, in the opinions in
*Steerman* v. *State*, 10 Mo. 317, and *State* v. *Kelly*, 76 Me.
331, and by Mr. Justice BRADLEY in the *Guiteau Case* (note
47, Amer. Rep. 261.)

As to the contention that the statute before us violates
section 3, Art. III. Const. U. S., I need only say that that

section applies to United States court proceedings only, relating only to proceedings for offences against the United States. So does amendment 6: *Fox* v. *Ohio*, 5 How. 410; *Cook* v. *U. S.* 138 U. S. 157, 181 (11 Sup. Ct. Rep. 268); *Barron* v. *Baltimore*, 7 Pet. 243; *Spies* v. *Illinois*, 123 U. S. 131 (8 Sup. Ct. Rep. 21). Therefore the judgment of the Circuit Court denying the writ of *habeas corpus* is affirmed.

AFFIRMED.